40 F.3d 1306
 63 USLW 2335
 UNITED STATES, Appellee,
v.
Ralph DeMASI, Defendant, Appellant.
UNITED STATES, Appellee,
v.
Ronald MARTEL, Defendant, Appellant.
UNITED STATES, Appellee,
v.
Robert PAPA, Defendant, Appellant.
UNITED STATES, Appellee,
v.
Francis BONASIA, Defendant, Appellant.
UNITED STATES, Appellant,
v.
Francis BONASIA, Defendant, Appellee.
 Nos. 92-2062, 92-2064 to 92-2066 and 92-2142.
 United States Court of Appeals,
First Circuit.
 Heard Aug. 2, 1994.
Decided Oct. 26, 1994.
 
 Seth M. Kalberg, Jr., for appellant DeMasi; Cornelius H. Kane, Jr., for appellant Martel; Paul J. Garrity, Boston, MA, for appellant Papa; and J. Michael McGuinness, with whom McGuinness and Parlagreco, Salem, MA, was on brief, for appellant Bonasia.
 Timothy Q. Feeley, Asst. U.S. Atty., with whom Donald K. Stern, U.S. Atty., Boston, MA, was on brief, for appellee.
 Before SELYA, BOUDIN, and STAHL, Circuit Judges.
 STAHL, Circuit Judge.
 
 
 1
 Following a seventeen-day criminal trial, defendants Francis Bonasia, Ralph DeMasi, Ronald Martel, and Robert Papa were convicted by a jury of various charges stemming from the attempted armed robbery of a Brink's armored truck. On appeal, DeMasi, Martel, and Papa together, and Bonasia individually, raise a series of issues including denial of a suppression motion and challenges to sufficiency of the evidence and various portions of the jury instructions. Bonasia separately assigns error to the denial of severance motions and an evidentiary ruling. The government cross-appeals from the district court's decision in sentencing Bonasia to depart downward from the Sentencing Guidelines. We affirm the district court on all issues raised by the defendants. At the same time, we find that the district court incorrectly interpreted the Sentencing Guidelines in fashioning Bonasia's sentence. We therefore vacate Bonasia's sentence and remand for resentencing.
 
 I.
 Background
 
 2
 Because the defendants challenge the sufficiency of the evidence supporting their convictions, we recite the facts in the light most favorable to the verdict. United States v. Innamorati, 996 F.2d 456, 469 (1st Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 409, 126 L.Ed.2d 356 (1993).
 
 
 3
 Near the end of July 1991, Federal Bureau of Investigation ("FBI") agents learned that, sometime in late June, DeMasi and Martel had rented a summer campsite at the Pines Campground in Amesbury, Massachusetts. Subsequently, during the noontime hour on the five Tuesdays preceding Tuesday, September 10, 1991, FBI agents observed Martel at the parking lot of the Port Plaza Shopping Center in Newburyport, Massachusetts. Throughout that summer, a Brink's armored truck made a scheduled stop between noon and 1:00 p.m. on Tuesdays at the Shawmut Bank in the Port Plaza Shopping Center. Martel's visits to the Port Plaza parking lot corresponded with the scheduled stop of the Brink's truck. DeMasi accompanied Martel on four of these five visits, missing only the visit on Tuesday, August 27, 1991. Papa and defendant George Pinto[1] joined Martel and DeMasi at the parking lot during the visits on August 20, and September 3, 1991.
 
 
 4
 Bonasia was also present at the Port Plaza parking lot on Tuesday, September 3, 1991. While at the parking lot, he met separately with both DeMasi and Martel. A surveillance photograph taken during his meeting with Martel depicts Bonasia and Martel standing together looking toward the Shawmut Bank. Afterwards, Bonasia remained in the parking lot and observed the Brink's truck as it made its regularly scheduled stop at the Shawmut Bank.
 
 
 5
 On the evening of August 26, 1991, at around 9:45 p.m., an FBI agent observed Martel in the back seat of an automobile, registered to Bonasia's wife, stopped in front of the Shawmut Bank in the Port Plaza Shopping Center. Driving the automobile was an older white male who fit Bonasia's general physical description. After the vehicle stopped, DeMasi left the car, walked over to the bank and peered inside one of its windows. Later that evening, the vehicle was again observed at DeMasi and Martel's campsite. Bonasia's own gray Buick was observed entering and exiting the Pines Campground several times a week over the course of the summer, including at least three different times on August 30, 1991.
 
 
 6
 At approximately 8:15 a.m. on September 10, 1991, DeMasi and Martel left the Pines Campground. At 9:30 a.m., they were observed standing next to a dark green cargo van which was located on the far side of the Market Basket Mall directly adjacent to the Port Plaza Shopping Center. At this time, FBI agents identified the license plates on the van as stolen. Shortly before noon, DeMasi and Martel met with Bonasia in the Port Plaza parking lot. A series of photographs taken contemporaneously shows Bonasia first walking away from DeMasi's automobile, then turning back toward DeMasi, and finally looking down at his watch. That same morning, Papa and Pinto were also observed and photographed driving through the Port Plaza parking lot in a separate vehicle.
 
 
 7
 After meeting with Bonasia, DeMasi and Martel returned to the green van parked on the far side of the Market Basket Mall, where they were joined by Papa and Pinto. The four defendants exited their automobiles, leaving them unlocked and with the keys in the ignitions.[2] The green van, with Papa driving, was next observed entering the Port Plaza parking lot just prior to the time for the expected arrival of the Brink's armored truck. Upon entering the parking lot, Papa drove the green van away from the direct route to the Shawmut Bank and towards where Bonasia was parked. Bonasia had just moved his gray Buick from a more crowded area of the parking lot to a location more easily accessed by the green van.
 
 
 8
 Papa pulled the van adjacent to Bonasia's gray Buick and paused. Bonasia then leaned forward in his seat and gave Papa a "thumb's up" signal. After receiving this signal, Papa drove the green van away from Bonasia's automobile towards the Shawmut Bank.
 
 
 9
 Shortly thereafter, FBI agents stopped the green van and arrested DeMasi, Martel, Papa, and Pinto. At the time of the arrests, DeMasi was wearing brown cotton gloves, a nylon stocking pulled down over his forehead, and a bullet-proof vest. Pinto was wearing similar gloves, a nylon stocking, and had a pair of handcuffs in his waistband. Martel also wore gloves, and a third nylon stocking was found in the back of the van next to where he had been sitting. In the front seat next to where Papa had been sitting was a blue ski mask and an additional set of gloves. An operating portable scanner rested on the empty front passenger seat. A loaded semi-automatic nine millimeter Uzi carbine was found behind the front seat, and two loaded semi-automatic nine millimeter pistols and a loaded six-shot revolver were found in the rear compartment of the van.
 
 
 10
 At approximately the same time, Bonasia, who had been walking from a pay phone towards his gray Buick, was arrested by a Rhode Island State Trooper. At the time of his arrest, Bonasia was approximately five to eight feet from his automobile. Immediately after the arrest, an FBI agent standing near Bonasia's automobile observed a pair of binoculars on the front passenger seat inside the gray Buick.[3]
 
 
 11
 Defendants were tried together before a jury. Bonasia, DeMasi, Martel, and Papa were convicted of conspiring and attempting to commit bank robbery, in violation of 18 U.S.C. Sec. 371 and 18 U.S.C. Sec. 2113(a), and conspiring and attempting to affect interstate commerce by robbery, in violation of the Hobbs Act, 18 U.S.C. Sec. 1951. Additionally, all defendants were convicted on four counts of using or carrying a firearm in violation of 18 U.S.C. Sec. 924(c). Following the return of the verdicts on these charges, additional evidence was offered, and the jury subsequently found DeMasi, Martel, and Papa guilty on three counts of violating the felon-in-possession statute, 18 U.S.C. Sec. 922(g)(1).
 
 II.
 Discussion
 A. Alleged Pre-Trial Errors
 1. Suppression Ruling
 
 12
 Our review of the decision whether to grant or deny a suppression motion is "plenary." United States v. Sanchez, 943 F.2d 110, 112 (1st Cir.1991). We defer, however, to a district court's factual findings if, on a reasonable view of the evidence, they are not clearly erroneous. United States v. Beltran, 917 F.2d 641, 642 (1st Cir.1990).
 
 
 13
 DeMasi, Martel, and Papa challenge the district court's refusal to suppress evidence seized from the green van at the time of their arrests.[4] They concede that the FBI had probable cause to make the arrests and that, if their arrests were lawful, the van's search and the seizure of evidence were also lawful. Defendants contend, however, that the arrests violated the Fourth Amendment because the FBI effected them without a warrant. They maintain that probable cause arose no later than early on the morning of the arrests, when the FBI identified the green van that DeMasi and Martel had visited as bearing stolen license plates, and that the government should have procured an arrest warrant at that time. Ultimately, they argue that the government's delay and ultimate failure to obtain a warrant negates the legality of their arrests and the subsequent search and seizure of evidence. We disagree.
 
 
 14
 Defendants' argument rests on the proposition that the government's allegedly "predesigned" and "improper" delay somehow invalidated the defendants' otherwise proper arrests. The Supreme Court, however, has refused to attach significance to the fact that the government had ample time to obtain a warrant but declined to procure one. See United States v. Watson, 423 U.S. 411, 423-24, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976). Specifically, the Court stated that "[t]he necessary inquiry ... [is] not whether there was a warrant or whether there was time to get one, but whether there was probable cause" at the time of the arrest. Id. at 417, 96 S.Ct. at 824. Indeed, the government in Watson conceded that it had more than sufficient time to have obtained a warrant prior to the arrest. Id. at 414, 96 S.Ct. at 823; id. at 426, 96 S.Ct. at 829 (Powell, J., concurring) (as much as six days elapsed between time probable cause arose and the arrest). Hence, the Supreme Court has directly rejected the underpinnings of defendants' argument.
 
 
 15
 The Constitution does not require a warrant to effect an arrest in a public place. Id. at 423-24, 96 S.Ct. at 827-28. Moreover, law enforcement agents need only possess reasonable suspicion that a criminal activity is occurring in order to stop a moving automobile to investigate. United States v. Kimball, 25 F.3d 1, 6 (1st Cir.1994). Here, it is undisputed that the FBI agents had probable cause to stop the green van when it entered the Port Plaza Shopping Center. The arrests of DeMasi, Martel, and Papa were effected in a public place, the middle of the shopping center parking lot. Accordingly, no arrest warrant was required, and whether or not the FBI agents could have obtained one prior to making the arrests is irrelevant.
 
 2. Severance Rulings
 
 16
 We now turn to Bonasia's challenges to the district court's denial of his motions for severance. "Trial courts are afforded considerable leeway in determining severance questions." United States v. Pierro, 32 F.3d 611, 616 (1st Cir.1994). "We reverse the decision to deny a motion for severance only upon a showing of strong prejudice, demonstrating a manifest abuse of discretion that deprived the defendant of a fair trial." United States v. Nason, 9 F.3d 155, 158 (1st Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 1331, 127 L.Ed.2d 678 (1994). Prejudice, in this context, "means more than just a better chance of acquittal at a separate trial." United States v. Boylan, 898 F.2d 230, 246 (1st Cir.) (quotations omitted), cert. denied, 498 U.S. 849, 111 S.Ct. 139, 112 L.Ed.2d 106 (1990).
 
 
 17
 Bonasia maintains that severance was necessary to avoid the substantial prejudice he suffered due to the spillover effect from evidence admitted at trial against his codefendants, the effect of codefendant DeMasi's pro se representation, and the impact resulting when several members of the jury saw his codefendants enter the courtroom in handcuffs.[5] We are not persuaded.
 
 
 18
 Bonasia's spillover claim fails because he has not met his burden of showing substantial prejudice. Though it is true that substantial evidence admitted at trial dealt with him only indirectly, this factor alone does not amount to grounds for reversal. "It is well settled that '[e]ven where large amounts of testimony are irrelevant to one defendant, or where one defendant's involvement in an overall agreement is far less than the involvement of others,' the court of appeals must be 'reluctant to second guess severance denials.' " United States v. O'Bryant, 998 F.2d 21, 26 (1st Cir.1993) (quoting Boylan, 898 F.2d at 246). Moreover, "[w]here evidence featuring one defendant is independently admissible against a codefendant, the latter cannot convincingly complain of an improper spillover effect." Id. Bonasia, like his codefendants, was charged with conspiring and attempting to rob the armored Brink's truck. Thus, even if the government had tried Bonasia separately, nearly all of the evidence presented here would have been admissible in a separate trial against him to prove the object of the conspiracy and the attempted robbery. Therefore, Bonasia has not met his burden of showing that he suffered strong prejudice.[6]
 
 
 19
 Bonasia's complaint of prejudice resulting from DeMasi's pro se representation is equally without merit. A codefendant's pro se representation is not, without more, grounds for severance; a defendant must additionally show that strong prejudice resulted from the representation. United States v. Tracy, 12 F.3d 1186, 1194 (2d Cir.1993); Person v. Miller, 854 F.2d 656, 665-66 (4th Cir.1988), cert. denied, 489 U.S. 1011, 109 S.Ct. 1119, 103 L.Ed.2d 182 (1989); see also United States v. Cross, 928 F.2d 1030, 1039-40 (11th Cir.) (no "compelling prejudice" resulted from codefendant's pro se representation), cert. denied, --- U.S. ----, 112 S.Ct. 594, 116 L.Ed.2d 618 (1991), and cert. denied, --- U.S. ----, 112 S.Ct. 941, 117 L.Ed.2d 112 (1992). Bonasia, however, points us to no specific prejudicial incidents that occurred before the jury.[7] Bonasia therefore cannot convincingly argue that the district court should have granted severance on this ground.
 
 
 20
 Bonasia's final claim that he was prejudiced because the jury viewed his codefendants enter the courtroom in handcuffs is similarly unavailing. This incident occurred on the eleventh day of trial, when the jury was mistakenly brought into the courtroom before the defendants entered. The record reveals that, at most, no more than one or two of the jurors briefly observed a single defendant in handcuffs. After the incident, the district judge separately questioned each juror, inquiring whether each had either seen or heard anything unusual, and determined that the danger of prejudice to the defendants was insignificant. The court also carefully cautioned each juror not to discuss the questioning or anything he or she had noticed with the other jurors. We believe that the district court appropriately handled the incident and minimized any possible prejudice to the defendants. The district court therefore did not abuse its discretion in denying Bonasia's renewed severance motion on this ground. Cf. United States v. Pina, 844 F.2d 1, 8 (1st Cir.1988) (mistrial not warranted where three jurors saw defendant in shackles).B. Alleged Trial Errors
 
 1. Evidentiary Ruling
 
 21
 Bonasia challenges the admission at trial of testimony from an FBI agent who observed binoculars present on the front seat of Bonasia's gray Buick following Bonasia's arrest. Bonasia argues that the testimony was incorrectly admitted because all evidence resulting from two warrantless searches of his automobile (which, he argues, would include any evidence of the binoculars) had been suppressed prior to trial. This argument is without merit.
 
 
 22
 In general, we review a district court's decision to admit evidence for abuse of discretion. See, e.g., United States v. Fisher, 3 F.3d 456, 461 (1st Cir.1993). The suppression order excluded "all evidence obtained as a result" of the illegal searches of Bonasia's automobile. The order, however, did not and could not extend to evidence that derived from an independent legal source apart from the unlawful searches. See Murray v. United States, 487 U.S. 533, 536-41, 108 S.Ct. 2529, 2532-35, 101 L.Ed.2d 472 (1988) (explaining independent source doctrine). Thus, the question is whether the FBI agent's testimony concerning the binoculars had an independent source apart from the illegal searches. On this point, it is beyond doubt that "[i]f an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy." Horton v. California, 496 U.S. 128, 133, 110 S.Ct. 2301, 2306, 110 L.Ed.2d 112 (1990). Furthermore, "[t]here is no legitimate expectation of privacy, shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers." Texas v. Brown, 460 U.S. 730, 740, 103 S.Ct. 1535, 1542, 75 L.Ed.2d 502 (1983) (plurality opinion) (citation omitted); see also United States v. Ware, 914 F.2d 997, 1000 (7th Cir.1990); Brumfield v. Jones, 849 F.2d 152, 155 (5th Cir.1988).
 
 
 23
 The agent who testified at trial about the binoculars participated in neither the illegal searches of Bonasia's automobile nor Bonasia's arrest. At the time of the arrest, the agent was legitimately present in the parking lot, standing several feet away from Bonasia's automobile. At trial, the agent merely testified to observing the binoculars which were in "plain view" on the front seat of the vehicle. Therefore, the agent's testimony had an independent legal source apart from the illegal searches and was properly admitted.[8]
 
 2. Sufficiency of Evidence
 
 24
 We now turn to the defendants' challenges to the sufficiency of the evidence. In assessing evidentiary sufficiency, "[o]ur task is to review the record to determine whether the evidence and reasonable inferences therefrom, taken as a whole and in the light most favorable to the prosecution, would allow a rational jury to determine beyond a reasonable doubt that the defendants were guilty as charged." United States v. Mena-Robles, 4 F.3d 1026, 1031 (1st Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 1550, 128 L.Ed.2d 199 (1994), modified on other grounds sub nom., United States v. Piper, 35 F.3d 611 (1st Cir.1994). In arriving at our determination, we must credit both direct and circumstantial evidence of guilt, but "must do so without evaluating the relative weight of different pieces of proof or venturing credibility judgments." United States v. Echeverri, 982 F.2d 675, 677 (1st Cir.1993). We need not be satisfied that no verdict other than one of guilt could reasonably have been reached; rather, we need only satisfy ourselves that the record plausibly supports the verdict the jury did return. Id.
 
 
 25
 Bonasia complains that the evidence against him is insufficient to support his convictions for conspiracy and attempt. He maintains the government failed to offer any evidence that established his specific intent to join in either the criminal conspiracy or the attempt. Moreover, he argues that the evidence amassed against him does not support a finding that he performed a "substantial step" towards the completion of the attempted robbery. In essence, Bonasia contends that the evidence establishes only his mere presence at the scene of the crime, and his sporadic association with DeMasi and Martel. Again, we disagree.
 
 
 26
 To prove a charge of conspiracy, the government must establish beyond a reasonable doubt that an agreement or working relationship existed, that the agreement had an unlawful purpose, and that the defendant voluntarily entered into the agreement. See United States v. David, 940 F.2d 722, 735 (1st Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 2301, 119 L.Ed.2d 224 (1992). Moreover, the government must prove that the defendant both intended to agree and to effectuate the commission of the underlying offense that was the object of the conspiracy. United States v. Piper, 35 F.3d 611, 615 (1st Cir.1994). "[T]he proof of a defendant's conspiratorial involvement may consist of indirect evidence, including reasonable inferences drawn from attendant circumstances." Echeverri, 982 F.2d at 679.
 
 
 27
 To prove a charge of attempt, the government must show beyond a reasonable doubt the defendant's intent to commit the offense charged and that the defendant performed a substantial step towards the completion of the offense. United States v. Argencourt, 996 F.2d 1300, 1303 (1st Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 731, 126 L.Ed.2d 694 (1994). Respecting Bonasia's "mere presence" argument, we have noted that " 'the culpability of a defendant's presence hinges upon whether the circumstances fairly imply participatory involvement. In other words, a defendant's "mere presence" argument will fail in situations where the "mere" is lacking.' " United States v. Torres-Maldonado, 14 F.3d 95, 100 (1st Cir.1994) (quoting Echeverri, 982 F.2d at 678), cert. denied, --- U.S. ----, 115 S.Ct. 193, 130 L.Ed.2d 125 (1994).
 
 
 28
 The government's evidence against Bonasia is clearly sufficient to support the jury's finding of guilt beyond a reasonable doubt on both the conspiracy and the attempt counts. Bonasia's presence at the September 3, 1991, surveillance and his August 26, 1991, nighttime visit to the parking lot with DeMasi and Martel plausibly support an inference that he participated in the planning of the attempted robbery. This inference is strengthened by Bonasia's frequent visits over the course of the summer to DeMasi and Martel's campsite at the Pines Campground.
 
 
 29
 Moreover, Bonasia's activities on the day of the arrest tend to establish his complicity. Even aside from the much disputed "thumb's up" signal,[9] Bonasia's activities on September 10, 1991, go well beyond mere presence. He arrived at the parking lot more than an hour before the scheduled arrival of the Brink's truck and met with DeMasi and Martel. Moreover, an FBI agent testified that, shortly before the green van entered the Port Plaza parking lot, Bonasia, who was pacing back and forth watching the area, tellingly gave the van in which the agent was riding a "very close look" as it drove up. This evidence supports an inference that Bonasia acted as a lookout during the attempted robbery. His participation is further corroborated by the fact that, upon entering the parking lot, Papa drove the green van towards Bonasia's gray Buick and pulled to a momentary stop alongside it before heading to where the Brink's truck was to make its scheduled stop. Significantly, prior to this detour, the defendants in the green van temporarily had been unable to view the area where they would encounter the Brink's truck. This underscores their need for a lookout. In sum, there is sufficient evidence to support a finding that Bonasia voluntarily and intentionally joined the conspiracy, and that he performed a substantial step towards the completion of the robbery.
 
 
 30
 Bonasia also challenges the sufficiency of the evidence on the related firearm convictions under 18 U.S.C. Sec. 924(c). He points out that these charges were submitted to the jury under an aiding and abetting theory, which requires the government to establish that the defendant knew that weapons would be used during the crime. See Torres-Maldonado, 14 F.3d at 103 (to sustain Sec. 924(c) conviction under an aiding and abetting theory "accomplice 'must have known to a practical certainty that the principal would be [using] a gun' " (quoting United States v. Powell, 929 F.2d 724, 728 (D.C.Cir.1991)). Bonasia contends that the record lacks any evidence to support a finding that he knew his codefendants would be using or carrying firearms during the attempted robbery.
 
 
 31
 As we have noted, the evidence adduced at trial more than adequately supports a finding that Bonasia joined in the conspiracy and participated in the attempted robbery of the Brink's truck. This same evidence likewise supports a finding that Bonasia knew that his four codefendants would be using or carrying firearms during and in relation to the attempted robbery. In particular, two different Rhode Island State Troopers testified that Bonasia remained in the parking lot on September 3, 1991, and observed the Brink's truck for the entirety of its scheduled stop. From this, a rational jury could conclude that Bonasia understood the scope of what a robbery of an armored truck with two armed guards would entail. It therefore could reasonably infer that Bonasia must have known that his coconspirators would be using weapons. As we have noted before, "[i]n the last analysis, criminal juries are not expected to ignore what is perfectly obvious." Echeverri, 982 F.2d at 679; see also United States v. Ingraham, 832 F.2d 229, 240 (1st Cir.1987), cert. denied, 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988).[10]
 
 
 32
 DeMasi, Martel, and Papa's sufficiency challenges need detain us only briefly. These defendants essentially contend that the evidence was insufficient to establish that they had the specific intent to rob the armored Brink's truck. They maintain that, at most, the government proved only that they were present in the rear of the green van in the Port Plaza parking lot with some unspecified illicit purpose. Defendants' argument is completely unconvincing.
 
 
 33
 Substantial evidence was introduced at trial which tended to establish that at least one of these defendants (and all of them at one time or another) was present and carefully observed the scheduled stop of the Brink's truck on each of the five Tuesdays preceding the foiled attempted robbery. In addition, an FBI agent testified that on September 3, 1991, DeMasi, Martel, and Papa waited for and then followed a Brink's truck as it made one of its scheduled stops prior to reaching the Port Plaza Shopping Center. From this evidence, a rational jury could conclude that the defendants intended to rob the Brink's armored truck. The evidence therefore supports the convictions of DeMasi, Martel, and Papa.
 
 3. Jury Instructions
 
 34
 We now turn to defendants' challenges to various portions of the jury instructions. Only the first of these, which assigns as error an instruction pertaining to the crediting of witness testimony, was raised before the district court. The remainder were raised for the first time on appeal. Accordingly, with the exception of the first, we will review all of defendants' challenges only for plain error. Fed.R.Crim.P. 30, 52(b); United States v. Whiting, 28 F.3d 1296, 1308 (1st Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 378, 130 L.Ed.2d 328 (1994) (No. 94-5760).
 
 
 35
 Defendants initially challenge a section of the jury charge in which the district court gave instructions on evaluating witness testimony.[11] As noted, the court instructed the jury that, in assessing the testimony, it should utilize the experience and skills it had attained from making everyday judgments and decisions. Moreover, the district court explained that in rendering these assessments "you try to make a judgment about who is giving the closest approximation of truth." Defendants contend that these instructions trivialized the fact-finding function of the jury and had the overarching effect of reducing the government's burden of proof. We are unpersuaded.
 
 
 36
 It is beyond dispute that the government must prove every element of a charged offense beyond a reasonable doubt. In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970). Failure of a verdict to be based on a finding of guilt beyond a reasonable doubt is a structural error of constitutional magnitude and is not subject to harmless error review. Sullivan v. Louisiana, --- U.S. ----, ----, 113 S.Ct. 2078, 2082, 124 L.Ed.2d 182 (1993). It is also true, however, that each piece of evidence and every "inference forming a part of the mosaic making up the jury's ultimate finding of guilt beyond a reasonable doubt need [not] itself be established beyond a reasonable doubt." United States v. Corgain, 5 F.3d 5, 10 (1st Cir.1993). Hence, the appropriate question on review is "whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the Winship standard." Victor v. Nebraska, --- U.S. ----, ----, 114 S.Ct. 1239, 1243, 127 L.Ed.2d 583 (1994). Moreover, in reviewing jury instructions, we measure each instruction, not in isolation, but within the context of the charge as a whole. United States v. Akinola, 985 F.2d 1105, 1112 (1st Cir.1993).
 
 
 37
 The challenged instructions do not endeavor to set forth the government's burden of proof (which the district court correctly described); instead, they guide the jury in evaluating and considering the credibility of witness testimony. This is not a situation in which the district court has attempted to define reasonable doubt by analogizing to the standard employed by individuals in the significant decisions of daily life. See, e.g., United States v. Nickens, 955 F.2d 112, 119-120 (1st Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 108, 121 L.Ed.2d 66 (1992); Dunn v. Perrin, 570 F.2d 21, 24-25 (1st Cir.), cert. denied, 437 U.S. 910, 98 S.Ct. 3102, 57 L.Ed.2d 1141 (1978). Instead, the court was merely exhorting the jury to fulfill its function by bringing common sense judgment to bear on the evaluation of the different and inevitably conflicting testimony of the various witnesses. This certainly does not constitute reversible error.
 
 
 38
 Moreover, as defendants concede, the district court accurately set forth the proper standard for the government's burden of proof in other sections of the charge. Our review of the instructions reveals that the district court referred to the "beyond a reasonable doubt" standard no less than twelve times in the nine pages of jury instructions preceding the isolated section challenged here. This overwhelming number of correct references negated any chance that the contested statements were misconstrued by the jury as somehow reducing the government's burden of proof. See United States v. Glenn, 828 F.2d 855, 861 (1st Cir.1987) (no reversible error where jury could not have been misled in light of numerous other correct instructions about presumption of innocence and government's burden).
 
 
 39
 Defendants, as we have noted, also raise for the first time several additional objections to the district court's jury instructions. Bonasia argues that the district court erred by giving an improper "Pinkerton " instruction concerning Bonasia's liability for the substantive crimes committed by his coconspirators. See Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946) (approving instructions that permitted jury to convict a conspirator for a coconspirator's acts that were committed in furtherance of the conspiracy). DeMasi, Martel, and Papa claim that the district court erred by incorrectly defining the elements of attempt, and by creating a logical progression of steps that inevitably led the jury to a guilty verdict. In addition, all four defendants object to various isolated statements which, they maintain, were prejudicial, assumed various material facts as true, and deprived them of their Sixth Amendment right to a jury trial. Though a few of the instructions identified by the defendants are problematic, we cannot say that, individually or collectively, they rise to the level of plain error.[12]
 
 
 40
 Under "plain error" review, the burden falls on the appellant to show that there is an error, that the error is "clear" or "obvious," and that it has affected "substantial rights." United States v. Olano, --- U.S. ----, ---- - ----, 113 S.Ct. 1770, 1776-9, 123 L.Ed.2d 508 (1993); Whiting, 28 F.3d at 1308. In most cases, an error will be found to have "affect[ed] substantial rights" only if inter alia the error was prejudicial such that it had an impact on the outcome of the trial. Olano, --- U.S. at ----, 113 S.Ct. at 1778.
 
 
 41
 Even then, our review is discretionary. Id. "[A] plain error affecting substantial rights does not, without more," warrant the exercise of this discretion. Id. at ----, 113 S.Ct. at 1779. A reviewing court should limit the exercise of this discretion to cases where the failure to act would result in a "miscarriage of justice" such as "the conviction or sentencing of an actually innocent defendant." Id. In other words, "we review only 'blockbusters: those errors so shocking that they seriously affect the fundamental fairness and basic integrity of the proceedings conducted below.' " United States v. Olivo-Infante, 938 F.2d 1406, 1412 (1st Cir.1991) (quoting United States v. Griffin, 818 F.2d 97, 100 (1st Cir.), cert. denied, 484 U.S. 844, 108 S.Ct. 137, 98 L.Ed.2d 94 (1987)).
 
 
 42
 We first consider Bonasia's objection to the district court's inclusion of an allegedly improper Pinkerton instruction.[13] Bonasia argues that he was prejudiced by the court's failure to limit liability under the Pinkerton doctrine to only those reasonably foreseeable acts of his coconspirators done in furtherance of the conspiracy. Bonasia claims that the failure to include the "reasonably foreseeable" qualification was tantamount to a directed verdict in favor of the government on the 18 U.S.C. Sec. 924(c) charge.
 
 
 43
 Because the government conceded error in its brief, we will assume arguendo that the district court's formulation of the Pinkerton charge was erroneous. The government nevertheless maintains that the Pinkerton instruction did not prejudice Bonasia. The government argues that the district court's previous instruction under an aiding and abetting theory--that in order to convict Bonasia the jury must find that he knew his coconspirators would use or carry firearms during the attempted robbery--alleviated any possible harm. The inclusion of a correct instruction directly contradicting an erroneous one, however, will not necessarily rectify the error because a reviewing court cannot determine with certainty which of the two irreconcilable instructions the jury followed. See Francis v. Franklin, 471 U.S. 307, 322, 105 S.Ct. 1965, 1975, 85 L.Ed.2d 344 (1985); Hill v. Maloney, 927 F.2d 646, 651 (1st Cir.1990). Accordingly, because we have no way of determining which instruction the jury applied, we must instead ask whether we can affirm the conviction based on the erroneous instruction.
 
 
 44
 Essentially, Bonasia claims that the district court omitted an element in its Pinkerton instruction, and that the omission, a fortiori, precluded the jury from making the necessary factual finding to support his conviction. What the law demands in order to show that a district court's omission or misdescription of an element did not affect a defendant's "substantial rights" is not entirely clear. See Whiting, 28 F.3d at 1309. Nevertheless, even under the most rigorous harmless error standard suggested, an error will be declared harmless in those rare cases where no rational jury could have found what it actually did find and not also find the omitted or misdescribed element. Carella v. California, 491 U.S. 263, 270-71, 109 S.Ct. 2419, 2423, 105 L.Ed.2d 218 (1989) (Scalia, J., concurring in judgment). This is such a case.
 
 
 45
 First, even under the contested instruction, the jury was required to find that Bonasia conspired with the other defendants to rob the armored truck. As we have stated above, the evidence amply supports the jury's verdict of guilt on this issue. Next, we have noted the strong nexus between the use or carrying of firearms and the successful completion of the robbery of an armored truck. See supra at 1316. This is not a case where the government sought to hold a defendant liable for the substantive crimes of his coconspirators that were not an integral part of the direct object of the conspiracy. Rather, the use of firearms during and in relation to the attempted robbery of the Brink's truck was part and parcel to the object of the conspiracy itself. Therefore, we find that no rational jury could have found that Bonasia conspired to rob the Brink's truck in the Port Plaza Shopping Center on September 10, 1991, without also finding that the use of firearms in that robbery would be reasonably foreseeable.[14]
 
 
 46
 DeMasi, Martel, and Papa also contend that the district court incorrectly instructed the jury on the elements of attempt. The district court did not give the "substantial step" instruction which has been uniformly adopted by the federal courts, see United States v. Rivera-Sola, 713 F.2d 866, 869 (1st Cir.1983), but instead stated:
 
 
 47
 One thing more is required beyond intent. And this is a fussy point. Mere preparation is not enough. There must be some act taken. You must be satisfied that the defendants or the defendant whom you are considering set himself on a path of action which, but for the intervention of the FBI, would in the ordinary course have led to the commission of the crime.
 
 
 48
 At oral argument, counsel for the defendants conceded that the instruction that the defendant must "set himself on a path of action which, but for the intervention of the FBI, would in the ordinary course have led to he commission of the crime" actually set forth a narrower standard than provided by a "substantial step" instruction. Nonetheless, defendants' counsel maintained that the preceding sentence ("There must be some act taken."), permitted the jury to find the defendants guilty on a standard substantially less than that called for in a substantial step instruction. Defendants' argument is baseless.
 
 
 49
 When the district court's instruction is read in context, as set forth above, it is fully apparent that the challenged statement was qualified by the subsequent "path of action" language. Plainly, the jury was instructed that not just any act taken but only those acts that would have set the defendants on the "path of action" inevitably leading to the commission of the crime would be sufficient to establish the charge of attempt. Because defendants concede that the "path of action" language established a narrower standard than that required by law, they were not harmed by the district court's variance from the usual instruction.
 
 
 50
 DeMasi, Martel, and Papa also contend that the district court led the jury through a progression of logical steps to the inevitable result of a guilty verdict. Primarily, defendants assert that by juxtaposing a scenario which the district court suggested would not constitute an attempt against the facts of the case, the district court strongly implied that an attempt had occurred.[15] Defendants maintain further that the district court continued the progression by stating later that "it's hard to imagine an attempt being accomplished without there having been a conspiracy, without there being an agreement." Finally, defendants complain that the district court compounded the error when it opined that "[f]our guys end up in a truck; common sense would tell you that there had to be some prior agreement to be there."
 
 
 51
 Once again, because defendants made no contemporaneous objection to this portion of the jury charge, we engage only in a plain error review, and once again, we find none. Defendants rely on United States v. Spock, 416 F.2d 165, 180-83 (1st Cir.1969), where we held that instructions that present the jury with a "logical progression" are forbidden. What was particularly offensive in Spock, however, was the submission of a special verdict to the jury in a criminal trial. We initially note that no special verdict was used here. Moreover, because they do not purport to instruct the jury on the intent element of attempt, we do not believe that the challenged instructions led the jury to the inevitable conclusion that an attempt had occurred. Indeed, in the preceding paragraph of instructions, the district court carefully instructed the jury on the element of intent, which was the most contested issue at trial, stating that: "Attempt is a different type of offense. For an attempt there has to be the intent to do the illegal act.... In the attempt situation, you have to find intent.... And again, you have to be satisfied beyond a reasonable doubt." Finally, the court ended the paragraph that included the challenged illustration with the reminder, "All right. So there are two elements of attempt." (Emphasis added.)
 
 
 52
 In sum, we are not persuaded that the challenged instruction created a logical progression that inevitably led the jury to a guilty verdict.[16]
 
 
 53
 Finally, all four defendants challenge various isolated statements which they contend were prejudicial, assumed controverted material facts as true and deprived the defendants of their Sixth Amendment right to trial by jury.[17] Though it might have been preferable if the statements had not been made, we cannot say that any of them so infected the entire charge to the jury as to undermine the fairness of the trial.
 
 
 54
 In analyzing the prejudicial effect of the challenged statements, we note that the district court cautiously admonished the jury that "when I talk about the evidence, it's my memory only. It's your memory that governs." The challenged statements, though problematic, are isolated snippets culled from over thirty pages of generally cautious, careful, and correct instructions. At most, the statements were inadvertent slips of the tongue with limited prejudicial force. See United States v. Lebron-Gonzalez, 816 F.2d 823, 830 (1st Cir.) (no plain error because judge did not supplant jury as fact finder as a result of inadvertent slip of tongue in jury charge), cert. denied, 484 U.S. 843, 108 S.Ct. 135, 98 L.Ed.2d 92, and cert. denied 484 U.S. 857, 108 S.Ct. 166, 98 L.Ed.2d 120 (1987).
 
 
 55
 Moreover, as we have noted, the evidence against DeMasi, Martel and Papa was overwhelming. We further note that, with respect to Bonasia, the evidence was likewise more than sufficient. We have no fear that the challenged statements caused the conviction of innocent defendants. After carefully reviewing the record, we are confident that no miscarriage of justice occurred.
 
 4. Other Matters
 
 56
 Bonasia makes two final arguments. First, Bonasia contends that in rebuttal the prosecution mischaracterized what certain FBI surveillance logs stated with respect to him. Nonetheless, Bonasia failed to object to this characterization at trial. "In the absence of a contemporaneous objection, we review allegations of prosecutorial misconduct for plain error, and will overturn a jury verdict only if the government's closing argument so poisoned the well that it is likely that the verdict was affected." United States v. Tuesta-Toro, 29 F.3d 771, 776-77 (1st Cir.1994) (internal quotations omitted). We are confident that there is no likelihood that the isolated statement affected the outcome of the trial.
 
 
 57
 Finally, Bonasia maintains that, if not individually, the cumulative effect of the various complaints he raises deprived him of a fair trial. Because we have found that none of Bonasia's individual complaints resulted in substantial prejudice and that most are completely without merit, we reject the final contention that his conviction was tainted by cumulative error. See id. (rejecting cumulative error argument); see also United States v. Barnett, 989 F.2d 546, 560 (1st Cir.) ("The Constitution entitles a criminal defendant to a fair trial, not a perfect one." (quotations omitted)), cert. denied, --- U.S. ----, 114 S.Ct. 148, 126 L.Ed.2d 110, and cert. denied, --- U.S. ----, 114 S.Ct. 149, 126 L.Ed.2d 110 (1993).
 
 C. Alleged Post-Trial Errors
 
 58
 On cross-appeal, the government raises two objections to the sentencing of Bonasia by the district court. The government challenges both the role-in-the-offense reduction awarded Bonasia and the downward departure of twenty-nine months granted him because of his record of charitable work and community service. We discuss each in turn.[18]
 
 
 59
 A sentencing court's decision to award a role-in-the-offense reduction "is heavily dependent on the facts of the particular case," U.S.S.G. Sec. 3B1.2, comment. (backg'd.). Accordingly, we review these fact-bound determinations only for clear error. United States v. Ocasio, 914 F.2d 330, 333 (1st Cir.1990). In reviewing decisions to depart from the Sentencing Guidelines, our review is broader. In a three-step analysis, we examine "(1) whether the reasons the court gave for departing are of the sort that might permit a departure in an appropriate case; (2) whether the record supports a finding of facts demonstrating the existence of such reasons; and (3) whether, given the reasons, the degree of departure is reasonable." United States v. Mendez-Colon, 15 F.3d 188, 189 (1st Cir.1994). With respect to the first prong of the analysis, we generally review a district court's determination that a case is unusual and therefore worthy of departure "with full awareness of, and respect for, the trier's superior feel for the case." United States v. Rivera, 994 F.2d 942, 952 (1st Cir.1993) (internal quotations omitted); see also United States v. Pelkey, 29 F.3d 11, 14 (1st Cir.1994). In conducting this inquiry, however, we do not owe deference to the district court when the issue turns on purely legal questions of guideline interpretation or whether the correct legal standard was applied. See Rivera, 994 F.2d at 950-52.
 
 
 60
 Turning to the government's first argument, we note that the district court determined that Bonasia's participation in the attempted robbery fell between a minor and a minimal role, thus warranting a three-level reduction in his base offense level. See U.S.S.G. Sec. 3B1.2 (granting reductions in base offense level to less culpable participants in the criminal activity). The government maintains, however, that the district court impermissibly based this determination on the fact that Bonasia's role as a lookout was less reprehensible than the roles of his codefendants and not because his conduct evinced less culpability. We do not find the district court's determination to be clearly erroneous.
 
 
 61
 A defendant can receive a role-in-the-offense reduction by fulfilling two requirements. First, the defendant must convince the sentencing court that the defendant was less culpable than most of the participants in the criminal activity. See U.S.S.G. Sec. 3B1.2, comment. (n. 1-3); United States v. Gregorio, 956 F.2d 341, 344 (1st Cir.1992). Second, the sentencing court must also be persuaded to find that the defendant was less culpable than the "average person" who commits the same offense. Gregorio, 956 F.2d at 344; cf. U.S.S.G. Sec. 3B1.2, comment. (backg'd). Here the record reasonably supports the district court's decision to grant a reduction. Specifically, the district court plausibly inferred from the totality of the evidence (including, for example, the fact that Bonasia attended only one of the Tuesday surveillance meetings) not only that Bonasia played a limited part in the planning of this particular offense, but also that, within the universe of individuals convicted of conspiring and attempting to rob banks with the aid of firearms, Bonasia was less involved (and, hence, less culpable) than most. We believe, therefore, that the district court's determination is not clear error.
 
 
 62
 The government's next contention is that the district court erred in making a downward departure of twenty-nine months in the calculation of Bonasia's sentence. The government complains that in deciding to depart because of Bonasia's history of charitable work and community service, the court improperly compared Bonasia to "the typical bank robber" and not to other defendants with comparable records of good works. We agree with the government on this issue.
 
 
 63
 Before a sentencing court may depart in a specific case, it must ask:
 
 
 64
 1) What features of this case, potentially, take it outside the Guidelines' "heartland" and make of it a special, or unusual, case?
 
 
 65
 2) Has the [Sentencing] Commission forbidden departures based on those features?
 
 
 66
 3) If not, has the [Sentencing] Commission encouraged departures based on those features?
 
 
 67
 4) If not, has the [Sentencing] Commission discouraged departures based on those features?
 
 
 68
 Rivera, 994 F.2d at 949. A court's subsequent analysis varies depending on the category in which the feature justifying departure falls.
 
 
 69
 If the feature or reason for departure falls into the discouraged category, the mere presence of the feature (no matter how unusual that mere presence might seem) will not by itself take the case outside the Guidelines' "heartland." Id. at 948. This is true because the philosophy underlying the Guidelines dictates that whether or not these features are present in a case is "not ordinarily relevant" in determining a defendant's sentence. Id. A discouraged-feature departure is warranted only if the "nature and magnitude" of the feature's presence is unusual or special. Id. To make this determination, a court must ask "whether the case differs from the ordinary case in which those [discouraged] features are present." Id. at 949; see also United States v. Jackson, 30 F.3d 199, 202 (1st Cir.1994); United States v. Sclamo, 997 F.2d 970, 973 (1st Cir.1993). Moreover, before a court may lawfully decide to depart, "it must explain how the case (compared to other cases where the [discouraged] reason is present) is special." Rivera, 994 F.2d at 951; see also Jackson, 30 F.3d at 202; Sclamo, 997 F.2d at 973.
 
 
 70
 Whether or not departure for a certain feature is discouraged turns, of course, on a reading of the Guidelines. Specifically, the Sentencing Guidelines provide that "civic, charitable, or public service, ... and similar prior good works are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." U.S.S.G. Sec. 5H1.11, p.s.[19] Therefore, a defendant's record of charitable work and community service falls into the discouraged-feature category of justifications for departure. See Rivera, 994 F.2d at 948.
 
 
 71
 In the present case, the district court chose to depart from the Guidelines because Bonasia's charitable work and community service stood apart from what one would expect of "the typical bank robber." The court, however, did not compare Bonasia's history of charitable and community service to the histories of defendants from other cases who similarly had commendable community service records. The court stated that:
 
 
 72
 If this was a securities fraud case or bank fraud case, probably the downward departure would not be appropriate. Because presumably people of the sort that Dr. Bonasia is [i.e., individuals who have a past record of charitable work and community service] are likely to engage in those activities and be within the contemplation of the Sentencing Commission.
 
 
 73
 In so stating, the court at least implied that it did not consider Bonasia's good works to be unusual or exceptional if compared to other defendants with past records of commendable service. Moreover, the court erred by restricting the scope of its comparison to only bank robbery cases. A court should survey those cases where the discouraged factor is present, without limiting its inquiry to cases involving the same offense, and only then ask whether the defendant's record stands out from the crowd. See Rivera, 994 F.2d at 953-54 (suggesting departure for discouraged factor might be warranted after comparing case to other cases involving the factor without regard to the underlying crime); Jackson, 30 F.3d at 202-03 (reversing decision to depart based on discouraged factor [age] after comparing facts of case to other cases involving age irrespective of underlying crime); but cf. United States v. Haversat, 22 F.3d 790, 795-96 (8th Cir.1994) (reversing departure because defendant's charitable and volunteer activities were not atypical for a defendant in an antitrust price-fixing case).
 
 
 74
 In sum, the district court erred when it declined to compare Bonasia's record of charitable work and community service to other cases where defendants similarly had records of past community service. We therefore must remand for reconsideration of this issue under the proper legal standard.[20]III.
 
 Conclusion
 
 75
 For the reasons stated above, we affirm the district court on all issues raised by the defendants. We, however, vacate Bonasia's sentence and remand for resentencing.
 
 
 
 [1]
 Pinto was tried and convicted along with the other defendants and joined in the consolidated appeal. Pinto, however, died on September 15, 1992, and his appeal was subsequently dismissed
 
 
 [2]
 Papa and Pinto also left the trunk of their automobile unlocked and open. Moreover, each of the two cars had stolen license plates affixed over their regular plates
 
 
 [3]
 Subsequent to Bonasia's arrest, FBI agents conducted two warrantless searches of Bonasia's automobile. Bonasia successfully moved prior to trial to suppress all evidence obtained from these searches
 
 
 [4]
 Bonasia also contests the failure to suppress the evidence seized from the green van. It is, however, axiomatic that Fourth Amendment rights are personal to the individual. Sanchez, 943 F.2d at 112. Bonasia was not present in the van during the arrest, nor does he own the van or claim any possessory rights in the seized evidence. Hence, Bonasia has no legitimate expectation of privacy on which to base his claim. See United States v. Sepulveda, 15 F.3d 1161, 1194 (1st Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 2714, 129 L.Ed.2d 840 (1994)
 
 
 [5]
 Bonasia perfunctorily raises several additional arguments in support of his severance appeal, such as "antagonistic defenses" existing between him and his codefendants, his inability to obtain exculpatory testimony and his inability to sit with his counsel at trial. Bonasia failed to raise these issues at trial in support of his motions for severance. Moreover, on appeal, he fails to adequately explain how he was prejudiced by them. We therefore deemed them waived. See United States v. Lilly, 13 F.3d 15, 17-18 (1st Cir.1994) (failure to raise arguments below results in waiver) and United States v. Zannino, 895 F.2d 1, 17 (1st Cir.) (perfunctorily raised arguments waived), cert. denied, 494 U.S. 1082, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990)
 
 
 [6]
 We also note that the district court was careful to sever the three felon-in-possession counts charged only against Bonasia's codefendants. These issues were tried to the jury after it had returned a verdict on all the other charges
 
 
 [7]
 Bonasia cites two statements by DeMasi as being inflammatory and prejudicial, but the first occurred at a pretrial hearing and the second occurred at DeMasi's sentencing. Bonasia also notes that DeMasi allegedly threatened Bonasia's trial counsel over a dispute concerning the order in which defendants would present final arguments. The alleged threat, however, occurred outside of the courtroom and after the close of evidence. Bonasia's counsel brought the alleged threat to the attention of the judge, who ordered all the defendants to present arguments in alphabetical order. Nevertheless, Bonasia's counsel agreed to argue fourth with DeMasi arguing last. We cannot say that this change in the order of final arguments deprived Bonasia of a fair trial
 
 
 [8]
 Bonasia also challenges a reference by the district court to the binoculars in the jury instructions and a similar reference by the prosecutor in summation. Because we rule that the testimony concerning the binoculars was properly admitted, neither of the challenged references was improper
 
 
 [9]
 Bonasia fervently maintains that we should disregard the FBI agent's testimony concerning the alleged sighting of the "thumb's up" signal because, under the conditions, such a sighting was a "physiological impossibility." Bonasia's "thumb's up" signal was observed by an FBI special agent who was located in an undercover van in the parking lot some 60 to 65 yards away. The agent made his observation while peering through a hole in a plastic sheet that covered the windows of the van. At trial, both sides introduced photographs relating to whether the observation was possible
 
 
 [10]
 In a submission after oral argument, Bonasia directed this court to United States v. Medina, 32 F.2d 40 (2d Cir.1994), in which the Second Circuit reversed a defendant's conviction for aiding and abetting a violation of 18 U.S.C. Sec. 924(c) due to insufficient evidence. Notwithstanding the defendant's knowledge of expected firearm use and role in instigating the planning of the crime, the Second Circuit held that the evidence was insufficient to show that the defendant "consciously and affirmatively assisted" in the specific Sec. 924(c) violation. Id. at 45
 Here, Bonasia's circumstances are clearly different from those in Medina. The defendant in Medina was not present at and did not participate in the commission of the underlying felony. Id. at 42-43. Indeed, this fact weighed significantly in Second Circuit's analysis. Id. at 46 ("Had Medina been present at the attempted robbery, we would consider whether his conduct at the scene facilitated or promoted the carrying of a gun, or whether he benefitted from the gun's use so that he could be said to constructively possess the gun; but he was not there." (citation omitted)). Here, Bonasia was present at and played a significant part in the attempted armed robbery.
 
 
 [11]
 The defendants objected to the underlined language which is set out in context below:
 How do you deal with witnesses? Well, most of the Government witnesses in this case have been FBI agents. Not all of them, but certainly the bulk of the testimony has come in through FBI agents. There's nothing magic about them. You give the FBI agents the same scrutiny as you would anybody else, and you test their credibility by listening to them, determining what you can from tone of voice and expression of face. You try to search out the interior logic of their testimony: does it all fit together, does the body English that goes with the testimony give you a clue. You may consider that. It may give you a clue as to reliability, as to the confidence that the witness has. It may give you a clue as to whether the defendant is lying. In short, you use all of the techniques that you have developed in your lives for determining whether somebody is giving you reliable information.
 You do this all the time. You go and buy a major appliance or an automobile. You listen to the salesman. You listen to political candidates, you try to sort out disputes in your own household, perhaps the children or the in-laws or the neighbors or something, and you try to make a judgment about who is giving you the closest approximation of the truth. That's probably about what we get at best. And you have to be satisfied that all of these stories together, all of this testimony together, with its blemishes and defects, satisfies you beyond a reasonable doubt of the defendant's guilt before you can return a finding of guilty.
 Now, you can take part of a witness's story, part of a witness's testimony and reject others. You can take the part that seems to be reliable and reject what is unreliable, or what appears to be unreliable. You can also say, well, if this man is unreliable in one respect, I won't trust him in any other. But it is up to you. Those judgments are yours. That's what you're here for.
 
 
 [12]
 In his reply brief, defendant Bonasia makes one additional challenge to the jury instructions. Bonasia argues that a portion of the charge is nearly identical to language this court held to be reversible error in United States v. Harrigan, 586 F.2d 860 (1st Cir.1978). In Harrigan, the district court instructed the jury "that the defendant's evidence has no greater function than simply to raise a reasonable doubt in your minds, if it does. The defendant is not required to go any further." Id. at 862. In the present case, the district court stated that "[t]he defendants' efforts have one purpose only and no more than one purpose. And that is to create reasonable doubt." Bonasia maintains that this instruction created the impression that the defendant had the burden to prove reasonable doubt
 Neither Bonasia nor any of his codefendants objected to this portion of the charge at trial. Moreover, Bonasia raised this issue only in his reply brief. As this court has consistently held, issues raised for the first time in appellant's reply brief are generally deemed waived. United States v. Brennan, 994 F.2d 918, 922 n. 7 (1st Cir.1993); United States v. Michaud, 925 F.2d 37, 43 n. 8 (1st Cir.1991); United States v. Benavente Gomez, 921 F.2d 378, 386 (1st Cir.1990). So it is here. And, in any event, we discern no plain error in this instruction. Unlike Harrigan, the jury was not told that the defendant was "required" to do anything; instead, it was only told, if somewhat clumsily, what defendants were trying to do in this case.
 
 
 [13]
 Bonasia objects to the following portion of the charge:
 I should also point out another principle of law which has to do with Dr. Bonasia's liability. If you find that he was a member of the conspiracy, then under the holding of the case called Pinkerton versus the United States, he is liable for all of the acts taken by the coconspirators during the time--or starting with the time that he became a member of the conspiracy. So a member of a conspiracy is liable for all of the acts done in furtherance of the conspiracy by the other conspirators. And that has to do with this gun charge.
 
 
 [14]
 During oral argument, Bonasia's counsel belatedly argued that the legal standard set forth by the district court's aiding and abetting instruction was inadequate in light of United States v. Torres-Maldonado, 14 F.3d 95 (1st Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 193, 130 L.Ed.2d 125 (1994) (No. 94-93). In Torres-Maldonado, we noted that, with regard to 18 U.S.C. Sec. 924(c) convictions under an aiding and abetting theory, "[i]t is well settled ... that an accomplice 'must have known to a practical certainty that the principal would be [using] a gun.' " Torres-Maldonado, 14 F.3d at 103 (quoting United States v. Powell, 929 F.2d 724, 728 (D.C.Cir.1991)). Here, the district court specifically instructed:
 You have to be satisfied in order to hold Dr. Bonasia liable that he had intended to participate and that he had an expectation--you must find beyond a reasonable doubt that he had an expectation that firearms would be used in carrying out the crimes, that he should have, that he would in the ordinary course have known that firearms were to be used. You don't have to be satisfied that he saw them, but you have to be satisfied that when, if he did undertake to be a part of this plan, that he understood that part of the plan was going to involve the use of firearms, having in mind that the Government's position is that the plan was to hold up the armored car and take the banks' money out of it.
 Bonasia waived this issue by failing to raise it prior to oral argument. See Sheinkopf v. Stone, 927 F.2d 1259, 1263 (1st Cir.1991) (issues raised only at oral argument are waived). In any event, we are not convinced that the district court's instruction was incorrect.
 
 
 [15]
 The contested section of the charge is as follows:
 Now, as I say, mere preparation is not enough. This evidence of surveilling would not have been enough. I would suppose that, let's say on September 10th they got opposite the McDonald's and they said, ["]gee, its hot in this truck and all these things I'm wearing are very uncomfortable and sticky. Let's quit the whole thing and go into McDonald's and get a milk shake. ["] At that point, the progress would have stopped. And I suggest to you it probably would not have been close enough to be an attempt. It was not stopped by the FBI if they stopped themselves. But then you can consider from all of the evidence you have heard about the passage of the truck, where the Brink['s] truck, in the ordinary course, would have been, whether they had set themselves on a path of action which, but for the intervention of the FBI, would in the ordinary course have led to the commission of the crime.
 
 
 [16]
 We also rule that neither of two additional statements that DeMasi, Martel, and Papa contend buttress their logical progression argument constitute plain error. Even if we assume that the statements prejudiced the defendants to some degree, we note that the evidence with respect to DeMasi, Martel, and Papa was overwhelming. There is no chance that innocent defendants were convicted as a result of the challenged statements. Accordingly, no miscarriage of justice occurred
 
 
 [17]
 First, DeMasi, Martel, and Papa contest the district court's following comment on the evidence: "But you do have some things about which there are no mistakes, the most significant being that four of these defendants were found in the truck with guns." Bonasia makes a similar complaint about the reference to "robbing from a bank, and you had evidence about that." DeMasi, Martel, and Papa also object to the following statement made by the court while elaborating on the action element of the crime of attempt: "Now as I say, mere preparation is not enough. This evidence of surveilling would not have been enough." They further find offensive the court's reference to "this attempted robbery" which it made while instructing on the 18 U.S.C. Sec. 924(c) firearm charges. In addition, DeMasi, Martel, and Papa challenge a comment the court made while explaining the aiding and abetting theory on which Bonasia was charged: "He himself did not--was not in the truck. He did not make the attempt. But he is charged with being an aider and abettor." Lastly, Bonasia challenges the comment: "Four guys end up in a truck, common sense would tell you that there had to be some prior agreement to be there."
 
 
 [18]
 DeMasi, Martel, and Papa also appeal the calculation of their sentences, contending that the district court erred in finding the value of the intended loss for sentencing purposes. The district court's determination was a factual finding which we review only for clear error. 18 U.S.C. Sec. 3742(e). The district court found the value of the intended loss to be $400,000, which was the lowest of three alternatives presented in the Presentence Report. Defendants argue that a fourth scenario existed where the intended loss would have been only $24,000. After reviewing the record, however, we cannot say the district court's finding was clear error. See United States v. Morillo, 8 F.3d 864, 871 (1st Cir.1993) ("Where ... evidence fully supports more than one inference, a sentencing court's choice from among plausible alternatives cannot be clearly erroneous.")
 
 
 [19]
 The fact that Sec. 5H1.11 was not promulgated until November 1, 1991, after the offense conduct but before the sentencing in this case, does not make it irrelevant to the present issue. The district court must use, subject to ex post facto concerns, the Guidelines that are in effect on the date of sentencing. 18 U.S.C. Sec. 3553(a)(4). Moreover, 28 U.S.C. Sec. 994(e) reveals Congress's intention that consideration of factors such as "employment record, family ties and responsibilities, and community ties " are generally inappropriate in sentencing decisions. Hence, the enactment of Sec. 5H1.11 merely clarified the Guidelines and did not mark a substantive change. Cf. Isabel v. United States, 980 F.2d 60, 62-63 (1st Cir.1992) (clarifications of the Guidelines may be applied retroactively, substantive changes may not); but see United States v. O'Brien, 18 F.3d 301, 302 (5th Cir.1994) (eschewing reliance on Sec. 5H1.11 due to ex post facto concerns, nonetheless vacating departure because defendant's charitable work and community service were products of defendant's professional record and professional skills, which are discouraged factors under Sec. 5H1.2 (vocational skills) and Sec. 5H1.5 (employment record)), cert. denied, --- U.S. ----, 115 S.Ct. 199, 130 L.Ed.2d 130 (1994) (No. 94-159). In any event, Bonasia did not challenge the use of Sec. 5H1.11 in the court below and, therefore, has waived any challenge to its applicability in his case
 
 
 [20]
 We do not offer any opinion on whether Bonasia's record of charitable work and community service warrants departure given the proper comparison. We leave this determination to the discretion of the district court