JOHN R. GIBSON, Senior Circuit Judge.
 

 Michael and James Murray appeal their convictions of one count of conspiracy to distribute marijuana, three counts of possessing marijuana with intent to distribute, and one count of attempt to possess with intent to
 
 *222
 
 distribute, all relating to transporting truck loads of marijuana from Texas to Boston in August and November 1989 and February 1991. Jaime Catano was convicted of two possession counts, the attempt count and a count of continuing criminal enterprise. Leonel Catano was convicted of one of the possession counts, as well as the conspiracy and the attempt. All challenge their convictions on numerous grounds, and Michael Murray appeals his sentence. We affirm the judgments, but we remand Michael Murray’s sentence for further findings.
 
 [1]
 

 Beginning in 1987 the Murrays and Cata-nos headed up an organization that transported loads of marijuana in tractor-trailers from Texas to Boston or the New York area. The government’s case consisted principally of the testimony of two truck drivers, Haleott Lawrence and Morton Todd; of Richard Baker, who allowed the storage of marijuana on his property; of a government informant, Frank Nigro; and of DEA surveillance agents.
 

 Leonel Catano first recruited Lawrence in 1987 to drive a truck load of 1,000 pounds of marijuana from Houston, Texas to New York. After that, Lawrence drove other, similar loads from Beeville, Texas to Boston. Lawrence would first pick up a cover cargo, usually of onions or plastic pellets, then drive to a farm near Beeville, Texas, where workers would hide bales of cellophane-wrapped marijuana under the cover cargo. Each time when Lawrence would arrive in Boston, he would call James Murray to announce his arrival, then drive to a rendezvous point where one or both of the Murrays and “a bunch of ... guys” would be there to unload the truck. James Murray usually paid Lawrence.
 

 In August 1989, Lawrence recruited Morton Todd to drive a load from Texas to Boston. Lawrence drove up separately. When Todd and Lawrence got to Boston with the marijuana, they met Jaime Catano and the two Murrays. Jaime Catano paid Todd his wages of $12,000, less expenses Todd had already received.
 

 Todd drove another load to Boston in November 1989. He received the marijuana in Texas from the Murrays and Jaime Catano. When he arrived in Boston, the Murrays unloaded the truck and paid him.
 

 Frank Nigro, an informant, solicited Michael Murray, who agreed to supply him 1,000-2,000 pounds of marijuana. The government introduced a tape of a conversation that took place on November 1, 1991, between Nigro and Michael Murray. Murray discussed procuring marijuana from “Mexicans.” Murray said he had been “down there” and “seen merchandise,” and that he would go down and personally make the acquisition.
 

 Richard Baker twice permitted the Mur-rays to store loads of marijuana on his farm near Boston in the winter of 1989-90. In the winter of 1991, Leonel Catano and Roberto López showed up at Baker’s farm in a tractor-trailer hauling a steel tank. James and Michael Murray were there, and they unloaded 2,000 pounds of marijuana into a shed on Baker’s property. Over the next two weeks they parcelled out the marijuana into several ears. Baker said he saw Michael Murray and Jaime Catano with a sports bag full of cash after they had disposed of the marijuana.
 

 At the time of the last delivery to Baker’s farm, the government was closing in. The truck driver, Roberto López, was actually working undercover for the government. Before López and Catano left on the trip to Boston, the DEA was aware of their itinerary. The DEA planted monitoring devices in the hotel where Leonel planned to stay in Kingston, Massachusetts, and arranged to book them into a bugged room. The agents video taped a conversation between López, Leonel Catano and the Murrays on November 2, 1991, in which they coordinated an imminent trip to Texas. Michael Murray was to “get the money ready;” Leonel Cata-no and López were to “go to Dallas, drop the box then just come, ah, bobtail
 
 [2]
 
 ... you know, with the money;” and James Murray was “to go and ... pay the other transportation people in Dallas.”
 

 
 *223
 
 After this conversation, Michael Murray left in a ear and Leonel Catano and López left in the truck. DEA agents followed Cata-no and López to Luling, Texas, where they dropped off the tank and trailer. They then “bobtailed”
 
 [3]
 
 south to McAllen, Texas on the Mexican border, where they met James Murray on November 5, 1991.
 

 On November 6, 1991, government agents (acting on a mistaken lead that the marijuana had already been delivered) arrested both Murrays and both Catanos in McAllen. They searched Leonel Catano’s truck and the steel tank left behind in Luling. The agents found no marijuana, but they did find $1,149,-650 hidden in a compartment in the tractor cab. They also located James Murray’s truck at the Dallas-Fort Worth airport and searched it, finding about $100,000 hidden in it.
 

 This brief outline of the evidence suffices for purposes of considering most of the arguments raised on this appeal. As other facts are material to the various arguments, we will supply more details.
 

 I.
 
 MICHAEL MURRAY’S
 
 SIMMONS
 
 [4]
 

 ARGUMENT
 

 Before trial, Michael Murray brought an omnibus motion for relief, which included claims based on an alleged plea bargain with the government for immunity from prosecution and suppression of evidence derived from his cooperation with the government. The plea agreement was not memorialized in any way. Michael Murray contended that the government agreed to advocate the lower end of a zero to five-year sentence if he would change his plea, assist the government in its investigation of a fentanyl manufacturing laboratory, help the government acquire six million dollars in offshore accounts, and be available to testify in this case. The government claimed it had extended two separate offers to Michael Murray: one for complete cooperation and one for partial cooperation. Complete cooperation required Michael Murray to plead guilty, assist the government in any and all investigations which the DEA suggested, be completely debriefed, surrender the six million dollars, and testify as requested. Complete cooperation would result in a government recommendation for five or fewer years incarceration. Alternatively, the government would recommend seventeen years incarceration if Michael Murray pleaded guilty and failed to fully cooperate in any way.
 

 The district court held an evidentiary pretrial hearing to determine what the agreement was and if Michael Murray was entitled to specific performance due to his fulfillment of the agreement as determined. Michael Murray argues that the district court erred in refusing to grant him immunity under
 
 Simmons v. United States,
 
 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), at this pretrial hearing, forcing him “to elect between his Fifth Amendment due process right to be heard on the question of his plea agreement with the government and his Fifth Amendment right not to be compelled to incriminate himself.”
 

 At the hearing, the court permitted Michael Murray’s counsel to call one of the prosecutors and a DEA case agent. Both testified about the offer and the areas in which they believed Michael Murray’s cooperation to be less than complete. Michael Murray’s counsel requested Simmons-type immunity for Murray if he testified regarding the plea offer and his performance. The district court refused to grant this immunity, but suggested that Michael Murray testify in two parts: first, on the terms of the government’s offer; and then, after the court ruled on the offer’s terms, on his performance under that offer. The court made clear that Michael Murray could refuse to testify on his performance of the agreement even if he chose to testify on its terms. Michael Murray declined to testify. The court then granted Michael Murray’s request that his affidavit regarding the plea offer be made part of the record of the hearing.
 

 
 *224
 
 The court found that the government had made the plea offers as it alleged and that, although Michael Murray had substantially performed, he had not completely performed. Specifically, the court noted that Michael Murray had not fully cooperated because, among other things: he did not plead guilty; he did not allow the government to debrief him in preparation for testifying against a defendant in the fentanyl case; he did not testify against that defendant; and he refused adequate access to his offshore accounts. The court determined that Michael Murray could accept the government’s plea offer by pleading guilty before the jury was impanelled. If Michael Murray did plead, then the question would arise of whether he cooperated completely or partially. At one point during the hearing, the prosecutor also stated, “Your Honor, if Mr. Murray’s willing to be completely debriefed to testify in any and all matters and to completely cooperate, the government is willing to stand by its offer_ That’s been our position throughout.” Michael Murray did not plead guilty, did not accept the plea offer, and went to trial on all counts.
 

 Entitlement to immunity is a legal question, which we review de novo.
 
 See United States v. Hardy,
 
 37 F.3d 753, 756 (1st Cir.1994) (holding that legal questions are reviewed de novo).
 

 We affirm the district court’s denial of Simmons-type immunity on these facts because Michael Murray did not have to surrender one constitutional right in order to assert another.
 
 See Simmons,
 
 390 U.S. at 394, 88 S.Ct. at 976. The procedure followed by the district court did not implicate Michael Murray’s Fifth Amendment right prohibiting compelled self-incrimination. If Michael Murray had testified regarding his understanding of the terms of the plea agreement, the district judge stated that he would have limited cross-examination to that topic. We agree with the district judge that “what was the deal is a lot more bland [than is the performance issue] and has nothing to do either with this case or, one would imagine, any other investigation.” We fail to see how Michael Murray’s testimony regarding what the government offered and what he understood would incriminate him in any way in any proceeding. He chose, however, not to testify.
 

 After Michael Murray’s counsel announced his intent not to testify, the district judge made findings as to the terms of the agreement. The judge specifically stated, and the prosecution agreed, that Michael Murray could still accept the plea offer prior to trial. He did not. Thus, the judge never reached the issue of Michael Murray’s performance, which was relevant only to determine whether Michael Murray had completely performed and accepted the more generous governmental offer or had only partially performed and accepted the lesser offer.
 

 Because he did not plead guilty prior to trial, Michael Murray failed to cooperate as promised under either version of the plea agreement.
 
 See United States v. Baldacchino,
 
 762 F.2d 170, 179 (1st Cir.1985). Thus, the government is released from any obligations under the agreement “regardless of whatever it may have promised earlier.”
 
 United States v. Tilley,
 
 964 F.2d 66, 70-71 (1st Cir.1992).
 

 Simmons
 
 is inapplicable on these facts.
 

 II.
 
 NIGRO’S TESTIMONY
 

 Frank Nigro testified regarding several conversations he had with Michael Murray in October 1991, one of which the government recorded and played to the jury. Michael Murray argues error in the admission of the substance of both the direct examination and of the redirect examination.
 

 A. Nigro’s Direct Testimony
 

 Michael Murray’s counsel objected that Nigro’s testimony was “gratuitous talk” about marijuana, unrelated to the crimes charged or to “any particular incident in the past.” Before Nigro testified, the district judge stated that “[t]he statements by Michael Murray ... are admissions so they’re admissible as against Mr. Murray.” Fed. R.Evid. 801(d)(2)(A).
 

 On direct examination, the government confined its questions to the period from September 1991 to November 1991, when Nigro was cooperating with the DEA on this ease. Nigro testified that he met with Michael Murray and asked if Murray had any marijuana for sale. Nigro stated that after several such meetings, Michael Murray agreed to “front” Nigro between
 
 *225
 
 1000 and 2000 pounds of marijuana. Near the close of Nigro’s direct examination, the government played a tape of one of the Nig-ro-Murray meetings. In that conversation, Michael Murray generally described his experience with importation of marijuana from Colombia and Mexico, from getting the marijuana across the river to weighing marijuana to piecing together loads of marijuana from different suppliers. The district court did not abuse its discretion by admitting either Nigro’s testimony on direct examination or the tape-recorded conversation between Michael Murray and Nigro. Both were properly admissible against Michael Murray as admissions.
 
 [5]
 
 Michael Murray’s part of the conversations constituted non-hearsay admissions of a party. Fed.R.Evid. 801(d)(2)(A);
 
 United States v. McDowell,
 
 918 F.2d 1004, 1007 (1st Cir.1990). Nigro’s part of the conversations served as “‘reciprocal and integrated utterance(s),’ ”
 
 McDowell,
 
 at 918 F.2d at 1007 (quoting
 
 United States v. Metcalf,
 
 430 F.2d 1197, 1199 (8th Cir.1970)), “reasonably required to place [Murray’s] admissions into context” and “make them intelligible to the jury.”
 
 Id.
 
 (internal quotation marks and citation omitted). Because Nigro’s statements were offered only for context and not for the truth of the matter asserted, those statements are not hearsay under Federal Rule of Evidence 801(c).
 

 B. Nigro’s Testimony on Redirect Examination
 

 On cross-examination, Michael Murray’s counsel attempted to discredit Nigro’s testimony by insinuating that Nigro barely knew Murray.
 
 [6]
 
 On redirect examination, the government asked Nigro how he first met Michael Murray. Michael Murray’s counsel objected. At a sidebar conference, the government argued that, on cross-examination, Michael Murray’s counsel opened the door to the earlier relationship between Nigro and Murray. The district court ruled that “[a]s to scope, I think this is all opened up because of the suggestion that this is absolutely bizarre conduct” and because, without this background, the meeting between Nigro and Michael Murray “seems to be such an isolated and strange event.” When Michael Murray’s counsel pressed for a ruling under Federal Rule of Evidence 404(b), the district court stated that “[the evidence] doesn’t have to be admitted as 404(b) but that is an alternative ground for the admission. You have opened this up, it’s admitted to him to show that this was not a bizarre picking someone out of a crowd and trying to entice them into drug trafficking.” The district court then ruled that the government’s fine of questioning was permissible, but admitted the resulting testimony only against Michael Murray. Nigro then testified that he was introduced to Michael Murray when Murray began working for Nigro in the marijuana business in 1977 or 1978. According to Nigro, in the following year, Michael Murray and Nigro’s three partners took full control of the operation, and Nigro continued to work for them in a more limited capacity. Three more marijuana shipments occurred under this arrangement.
 

 At the conclusion of Nigro’s testimony, the district court gave the jury the following limiting instruction:
 

 THE COURT: And I will tell you that Mr. Michael Murray is not here charged with any of the events which this witness testifies took place back in the late seventies, perhaps the early eighties. That has nothing to do with this case except, if you believe his testimony, it tends to place the conversation about which he testified, the tape that was played, if you believe that, in context. That’s the only reason you heard it. Mr. Michael Murray is not charged
 
 *226
 
 with anything back then, you’re not to consider that, except that to the extent that you, yourself, determine in the manner that I’ve just described.
 

 We review the district court’s rulings on the admissibility of evidence only for abuse of discretion.
 
 United States v. McCarthy,
 
 961 F.2d 972, 977 (1st Cir.1992).
 

 The district court did not abuse its discretion in permitting the government on redirect examination to explore the past business dealings of Nigro and Michael Murray.
 
 [7]
 
 The scope of redirect examination is discretionary with the trial court and should be reversed only upon a showing of abuse of discretion.
 
 United States v. Braidlow, 806
 
 F.2d 781, 782 (8th Cir.1986). A district court may allow testimony on redirect which clarifies an issue which the defense opened up on cross-examination even when this evidence is otherwise inadmissible.
 
 United States v. Geer,
 
 923 F.2d 892, 896-97 n. 4 (1st Cir.1991) (citing
 
 Braidlow,
 
 806 F.2d at 783). Otherwise, litigants could exploit the rules of evidence to create misleading impressions, secure in the knowledge that the other side was barred from disabusing the jury. On cross-examination, Michael Murray’s counsel opened the door to the past relationship between Murray and Nigro by making it seem that Murray did not know Nigro well enough to conduct drug business with him. The district court did not abuse its discretion by allowing redirect testimony to clarify that issue, and exercised abundant caution in instructing the jury on the limited consideration to be given such testimony.
 

 III.
 
 BAKER’S TESTIMONY
 

 There are two arguments concerning the testimony of Richard Baker, the witness who permitted the Murrays to store marijuana at his farm near Boston. Besides participating in the marijuana operation at issue in this trial, Baker also allowed his property to be used by an organization involved in manufacturing fentanyl, a dangerous synthetic drug, reported to have caused numerous deaths. This was the operation that Michael Murray claimed to have uncovered pursuant to his cooperation agreement with the government.
 

 First, Michael Murray claims that Baker’s testimony should be inadmissible because it was derived from Murray’s immunized statements, citing
 
 Kastigar v. United States,
 
 406 U.S.
 
 441, 92 S.Ct.
 
 1653, 32 L.Ed.2d 212 (1972). He argues that the government would not have had access to Baker had not Murray introduced him while cooperating in exposing the fentanyl operation. The government then “flipped” Baker and used Baker against Murray, instead of vice versa.
 

 Simply put, this is not a
 
 Kastigar
 
 issue, in which the government must prove it did not derive evidence from immunized statements. The district court in this case specifically found: “There was no grant of immunity here, implicit or explicit. Indeed, having reviewed my notes, it’s clear to me, and I so find, that the only offer was an offer against direct use of the testimony and not any derivative use.” The district court’s findings as to the terms the government offered Michael Murray are reviewable only for clear error.
 
 See United States v. McLaughlin,
 
 957 F.2d 12, 16-17 (1st Cir.1992). This finding is supported by the prosecutor’s testimony that he told Murray “the government was free to make derivative or indirect use of anything he said ... against him.” The district court was fi’ee to accept this testimony, especially in light of the fact that Murray offered no contrary evidence that he had obtained any agreement of derivative use immunity. These findings were not clearly erroneous.
 

 Second, the Caíanos argue that the district court erred in refusing to recall Baker as part of the government’s case, after the mid-trial discovery of certain notes which the Catanos say would have helped them impeach Baker. After Baker had been cross-examined,
 
 [8]
 
 he failed to appear on time for
 
 *227
 
 court the next day, apparently because of a snowstorm. The government waived its right to redirect, but also revealed that the government had located for the first time notes DEA Agent O’Hara had taken of a meeting with Baker. The prosecutor explained that the government had not been able to locate O’Hara’s notes earlier because they were in O’Hara’s personal files and O’Hara was away from the office dealing with a health crisis in his family. The prosecutor summarized the notes, which revealed that Baker admitted knowing involvement in the fentanyl operation. Though the government had produced documents earlier in which others implicated Baker in the fenta-nyl operation, the defendants had not cross-examined Baker about whether his testimony in the present case was affected by his hopes of leniency in the fentanyl case. Counsel for Leonel Catano explained his earlier decision not to cross-examine Baker about the fenta-nyl case as fear of opening a “Pandora’s box” without any written documents to indicate what Baker had said before about the fenta-nyl operation. (The fear of a “Pandora’s box” was certainly not chimerical, since the same notes which state Baker confessed to knowing participation in the fentanyl business also refer to the involvement in the fentanyl business of “two Hispanic males [Baker] ... thought were brothers, one of whom he testified to be Jaime Catano.”) After the disclosure of O’Hara’s notes, which counsel could use to impeach Baker on the stand, Leonel Catano’s counsel asked to recall Baker for cross-examination about the fentanyl case. The district court declined to recall Baker as part of the government’s case, but stated that the defendants could call Baker as their witness and that the court would give them “latitude in examining him.” The defendants refused to call Baker in their cases.
 

 The Caíanos now argue that there was a Brady-Giglio
 
 [9]
 
 violation in that the government failed to produce impeachment information in time for the defendants to use it in cross-examining Baker. “When the
 
 [Brady]
 
 issue is one of delayed disclosure rather than of nondisclosure, ... the test is whether defendant’s counsel was prevented by the delay from using the disclosed material effectively in preparing and presenting the defendant’s case.”
 
 United States v. Ingraldi,
 
 793 F.2d 408, 411-12 (1st Cir.1986). We review the district court’s decision on how to handle delayed disclosure of
 
 Brady
 
 material for abuse of discretion.
 
 See United States v. Sepulveda,
 
 15 F.3d 1161, 1178-79 (1st. Cir.1993), ce
 
 rt. denied,
 
 — U.S.-, 114 S.Ct. 2714, 129 L.Ed.2d 840 (1994).
 

 In this case, the prosecution offered a reasonable explanation of its failure to find the notes earlier. Most importantly, the Caíanos have not shown that the delay prevented them from using the materials. The defendants cross-examined Baker at length on the theme that he was testifying in order to get a lenient sentence for his participation in the marijuana ring. Further impeachment about his hopes to receive leniency in an additional case would have been cumulative, although admittedly the fentanyl case was more serious because of the deaths involved. Moreover, the Catanos were perfectly free to call Baker in their case to explore the fentanyl issue, and they simply chose not to. In view of the possibility that O’Hara’s notes would implicate them in the fentanyl operation, their decision not to open the door to this testimony seems to have been the better part of valor, rather than the result of the government’s delayed disclosure. The district court did not abuse its discretion on this issue.
 

 IV.
 
 JURY INSTRUCTIONS ON STANDARD OF PROOF
 

 The defendants make various arguments all tending to the same conclusion: that the jurors were misled about what standard of proof to apply.
 

 A. Objection to Use of the Phrase “Common Sense”
 

 James Murray argues that the prosecutors repeatedly urged the jurors to use “common sense” in evaluating the case and that this effectively lowered the standard of proof below the reasonable doubt standard. James Murray’s counsel moved for a mistrial on this ground. Though the district court denied the mistrial motion, it agreed to “make clear in [its] charge that the standard
 
 *228
 
 is beyond a reasonable doubt, and that’s not equivalent of common sense.” The court in fact addressed the distinction between common sense and proof beyond a reasonable doubt in its charge.
 
 [10]
 
 Murray did not object that the court’s treatment of the issue was inadequate in any way, but he now contends that the court failed “to respond to the improper arguments.” Since there was no contemporaneous objection, we review only for plain error affecting substantial rights, and resulting in a miscarriage of justice.
 
 United States v. DeMasi,
 
 40 F.3d 1306, 1317-19 (1st Cir.1994),
 
 cert. denied,
 
 — U.S. -, 115 S.Ct. 947, 130 L.Ed.2d 890 (1995).
 

 There is nothing improper about instructing the jury to use its common sense in deliberations.
 
 See DeMasi,
 
 40 F.3d at 1317-18;
 
 United States v. Ocampo-Guarin,
 
 968 F.2d 1406, 1412 (1st Cir.1992). The district court’s instructions drew a distinction between common sense, as methodology, and the beyond-a-reasonable-doubt standard, as a quantum of proof. The court also told the jury specifically that arguments of counsel were not determinative statements of the law: “It is perfectly appropriate now for counsel to have mentioned the law in their closings. That’s helpful. But take the law from me.” We see no reasonable probability that the jury could have been misled on this record, and we most certainly see nothing that approaches plain error resulting in a miscarriage of justice.
 

 There was no error in either respect.
 

 B. Objection to Instructing Jurors Not to Surrender “Strongly-held Views”
 

 Leonel Catano argues that the court misled the jurors when it instructed them about the deliberation process as follows:
 

 Now about deliberations. Deliberate about the case together. Don’t hesitate to reassess or reexamine your views in light of the views of your fellow jurors who have heard and seen exactly the same evidence that you’ve heard and seen and are under the same oath as you are to do justice.
 

 If you have a strong view about any aspect of this case, no one suggests that you surrender it. A unanimous verdict means the verdict of each juror independently agreeing. You’re permitted to deliberate together to see whether the views of other jurors do affect your view of the case.
 

 So it’s probably not a good idea to take a straw vote at the outset of your deliberations lest you feel that under your oath you’re somehow committed then to that particular view. That’s not so. Jury deliberations are, as I say, just that, deliberations. But you deliberate together to see whether you are affected by the views of your fellow jurors. You’re permitted to be, but don’t surrender your own views if you have some strongly-held view about any aspect of the case. We see through deliberations whether twelve jurors can come to a unanimous verdict either of not guilty or of guilty. There’s no pressure on you, but do understand that you are deliberating together.
 

 Leonel Catano contends that by instructing jurors not to surrender “strongly-held view[s],” the court lowered the standard of proof below the reasonable-doubt standard. He relies on
 
 Cage v. Louisiana,
 
 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 389 (1990) (per curiam), which the Supreme Court overruled in
 
 Estelle v. McGuire,
 
 502 U.S. 62, 73 n. 4, 112 S.Ct. 475, 482 n. 4, 116 L.Ed.2d 385 (1991). He also relies on
 
 Victor v. Nebraska,
 
 — U.S. -, 114 S.Ct. 1239, 127 L.Ed.2d
 
 *229
 
 583 (1994), which teaches that our inquiry must not be whether an instruction “ ‘could have’ been applied in unconstitutional manner, but whether there is a reasonable likelihood that the jury
 
 did
 
 so apply it.” — U.S. at-, 114 S.Ct. at 1243 (emphasis in original). We must consider the phrase Leonel Catano objects to (“strongly-held view[s]”) in the context of the rest of the charge.
 
 See id.
 
 at-, 114 S.Ct. at 1247.
 

 The court’s instruction about deliberations does not directly relate to the quantum of proof and could only affect the jury’s conception of the standard of proof indirectly. The gist of the sentence Leonel complains of is to inform the jurors that they need not surrender their opinions. The remainder of the deliberation instruction reminded jurors that “there’s no pressure on you.” When addressing the subject of burden of proof, the court specifically and repeatedly charged the jury that the government must prove its case “beyond a reasonable doubt.” We see no likelihood that the jury would have thought the instructions on standard of proof to have been superseded by some implication in the deliberation instruction.
 

 Leonel Catano also argues that the instruction was analogous to an Allen
 
 [11]
 
 instruction, with its potential for improperly coercing jurors to reach agreement, citing
 
 United States v. Angiulo,
 
 485 F.2d 37,40 (1st Cir.1973). The instruction Catano complains of was not coercive, as it simply informed the jurors of their right to maintain their opinions and did not pressure them to change. We conclude that the particular instruction not to surrender “strongly-held views” was not reasonably likely to cause the jurors to apply the instructions as a whole “in a way that violated the Constitution.”
 
 Victor,
 
 — U.S. -, 114 S.Ct. at 1251.
 

 V.
 
 MICHAEL MURRAY’S ROLE-IN-THE-OFFENSE ENHANCEMENT
 

 Michael Murray argues that the district court erred by enhancing his base offense level four levels under section 3Bl.l(a) due to his aggravating role in the offense. USSG § 3Bl.l(a) (Nov. 1993). He argues that the district court’s findings at the time of sentencing do not indicate either that he was an “organizer or leader,” as opposed to a “manager or supervisor,” or that the “criminal activity involved five or more participants or was otherwise extensive,” as required for a four-level enhancement under section 3Bl.l(a).
 
 [12]
 

 18 U.S.C. § 3553(c) (1988) requires that “[t]he court, at the time of sentencing, shall state in open court the reasons for its imposition of the particular sentence.” At sentencing here, the court stated only that “[t]he upward adjustment for Michael Murray 4 levels is appropriate. The Court finds by a fair preponderance of the evidence that he was the principal figure, the organizer, and a 4-level adjustment is appropriate.” The court did not, in open court, make specific findings regarding Murray’s involvement either by detailing on the record the facts developed during trial supporting its conclusion, or by adoption of findings in the presen-tence report.
 
 Compare United States v. Schultz,
 
 970 F.2d 960, 963-64 (1st Cir.1992) (affirming two-level enhancement under USSG § 3Bl.l(c) where the district court stated that the enhancement was “agreed upon by this court,” and that the “largely uncontested facts set forth in the PSR” supported the defendant’s exercise of control),
 
 cert. denied,
 
 — U.S.-, 113 S.Ct. 1020, 122 L.Ed.2d 167 (1993),
 
 with United States v. McDowell,
 
 918 F.2d 1004, 1011-12 (1st Cir.1990) (remanding a four-level enhancement where neither the PSR nor the sentencing transcript indicated the basis for enhancement).
 

 In
 
 Schultz,
 
 we held that the district court managed minimal compliance with Section 3553(c) where the court impliedly adopted the PSR and denoted each element in determining the guideline sentencing range. 970
 
 *230
 
 F.2d at at 963 n. 7. Furthermore, “[t]he PSR was the central focus of the issues presented at sentencing.”
 
 Id.
 
 The court in
 
 Schultz
 
 stressed that the PSR gave substantial support for the district court’s findings and for a reasoned appellate review.
 
 Id.
 
 at 963 n. 7, 964.
 

 In the case before us, the district judge adopted the PSR by checking the box on the judgment form before the statement: “The court adopts the factual findings and guideline application in the presentence report.” While in many simple cases this would be sufficient to impart to the defendant and an appellate court sufficient reasons for imposing a particular sentence, Michael Murray’s PSR does not clearly demonstrate why he was considered to be an “organizer or leader” as distinguished from a “manager or supervisor.” The PSR discusses the offense conduct over some twenty-two pages, containing some fourteen pages of taped conversations read to the jury. While some statements in the discussion might support a finding that Michael Murray played a leadership role, much in the report would support a finding that James Murray or the Caíanos played such a role. The PSR does not come to grips with the issue by explaining specifically, in a case with considerable scope and complexity, why Michael Murray was concluded to be an “organizer or leader” rather than a “manager or supervisor.” Without even a minimal analysis of the facts or articulation of its reasoning, the PSR simply states: “Michael Murray is regarded as the principle [sic] figure; he was the organizer and paymaster. A role adjustment under § 3Bl.l(a) is warranted, and is being applied.” The PSR makes no reference to specific evidence supporting that recommendation.
 

 The judge’s adoption of the factual findings and guideline application by checking the box on the judgment form on the facts of this case does not comply with section 3553(c), which requires a statement of reasons for imposing a particular sentence. The lengthy recitation of evidence in the PSR simply does not focus on the distinction required by the guidelines. If the PSR had set out a clearly stated, unequivocal explanation for holding Murray to be an organizer or leader (which we believe that it did not) the judge’s reference to the PSR might be adequate. Further, if witnesses had testified that Murray organized every facet of the drug operation and was the unequivocal leader, the bare finding that he was the organizer or leader might, standing alone, be sufficient. Under the circumstances before us, however, section 3553(c) can only be met by the district court’s explanation of why it selected the “organizer or leader” label, rather than that of “manager or supervisor.”
 

 We underscore that in a case where the PSR findings themselves adequately set forth a meaningful rationale for the sentence, a district judge does not err in adopting such findings. In a case such as that before us, however, with a lengthy chain of transactions and dealings between the several individuals involved, and with a PSR which is overly inclusive and which does not even minimally focus on the specific considerations necessary to differentiate between the two categories, it is necessary that the district judge make sufficient findings to articulate the rationale for the sentencing decision.
 

 Unlike
 
 McDowell,
 
 the case before us concerns not a total lack of findings on the question of the adjustment but, rather, their adequacy. However, we are left in the same position as in
 
 McDowell,
 
 “[without substantial guesswork, we cannot tell the basis on which the judge determined that the criminal activity was sufficiently extensive to permit the four level upward enhancement.” 918 F.2d at 1012. Neither the PSR nor the sentencing transcript discusses Murray’s involvement or identifies why he was held to be an “organizer or leader” as opposed to a “manager or supervisor.”
 

 In short, although the case record may very well support the four-level enhancement:
 

 there is nothing in the sentencing record about any of this. Absent explicit findings, it would be overly impetuous for us, on so exiguous a predicate, to jump to the conclusion that [the enhancement requirements were met]. A defendant in the dock, awaiting imposition of sentence, is entitled to reasoned findings, on a preponderance standard, not to an appellate
 
 *231
 
 court’s assumptions drawn free-form from an inscrutable record.
 

 Id.
 
 at 1012 n. 8. This is a troublesome, borderline case. We conclude, however, that the requirements of section 3553(c) have not been met because the district judge did not state in open court, with sufficient specificity, the reasons for deciding this particular issue, which substantially impacted Michael Murray’s sentence. We are satisfied that justice is best served by remand for further articulation of the reasons for imposing the adjustment in accordance with 18 U.S.C. § 3553(c).
 

 VI.
 
 REMAINING CLAIMS OF ERROR
 

 The appellants raise a number of other issues. We reject the claims of error in: (1) denying James Murray’s suppression motion; (2) denying Jaime Catano’s motion for severance; (3) denying Jaime Catano’s motion to participate in Michael Murray’s omnibus motion hearing; (4) managing the use of peremptory challenges; (5) refusing to define reasonable doubt; (6) convicting Jaime Cata-no of continuing criminal enterprise; and (7) refusing to adjust Michael Murray’s sentence for acceptance of responsibility or to depart downward. We discuss these issues in the attached unpublished portion of this opinion, as their disposition is not of sufficient prece-dential value to merit publication.
 

 We
 
 affirm
 
 the convictions, but
 
 vacate
 
 and
 
 remand
 
 Michael Murray’s sentence for further findings in accordance with this opinion.
 

 [1]
 

 . The published version of this Opinion includes only the background statement of facts and discussion of those issues that may be of general interest. The unpublished portion of the Opinion addresses other issues that do not appear to have precedential importance.
 
 See
 
 First Cir.R. 36.2.
 

 [2]
 

 . To "bobtail" means to drive a tractor without a trailer behind. In this context, the "box” would be the trailer.
 

 [3]
 

 .
 
 See
 
 footnote 1.
 

 [4]
 

 . In
 
 Simmons v. United States,
 
 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), the Supreme Court held that a defendant’s testimony in support of a motion to suppress evidence is inadmissible against him at a later trial to prove his guilt because the Court found it "intolerable that one constitutional right should have to be surrendered in order to assert another.”
 
 Id.
 
 at 394, 88 S.Ct. at 976.
 

 [5]
 

 . Michael Murray’s argument that the statements were not admissible as statements of a co-conspirator is misplaced. The co-conspirator exception applies to hearsay statements. The statements here are non-hearsay under Rule 801(c) and 801(d)(2)(A).
 

 [6]
 

 . MICHAEL MURRAY'S COUNSEL: And this man that you had seen on several occasions for ten minutes at a time over seven to ten, maybe twelve times, is going to front you a half a ton or a ton of marijuana without you paying for it, and you don’t know even where he lives?
 

 NIGRO: Yes.
 

 The following day, Michael Murray’s counsel again attempted to minimize the relationship between Nigro and Murray:
 

 MICHAEL MURRAY'S COUNSEL: Mr. Nigro, is it your testimony that from these brief encounters with Mr. Murray that he’s going to front you, meaning give you for nothing, some quantity of marijuana, uncertain, between a thousand pounds and 4,000 pounds, for nothing, without ever having discussed a price? Is that your testimony?
 

 [7]
 

 . The district court admitted this testimony only against Michael Murray and gave a limiting instruction as to the other defendants. In this appeal, the other appellants claim no prejudice by the admission of Nigro’s testimony on redirect.
 

 [8]
 

 . Counsel for Leonel Catano had noted that he would have cross-examined Baker regarding fen-tanyl if he had documentation showing what Baker had or had not admitted about the fenta-nyl operation. On the other hand, Jaime Cata-no’s counsel stated at trial that his client had ordered "not to get into the subject of fentanyl” with Baker.
 

 [9]
 

 .
 
 Brady v. Maryland,
 
 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and
 
 Giglio v. United States,
 
 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).
 

 [10]
 

 . The court stated:
 

 Now, focusing on the evidence now, how do you analyze it? What do you do with it? You're expected to use your common sense. You don't check your common sense at the door to the jury room. Just the reverse. I charge you that you use your common sense. You consider the evidence in the case for the purposes for which it has been admitted, you give it a reasonable and fair construction in light of your common knowledge of the natural tendencies and inclinations of human beings.
 

 Now, mention has been made of common sense, and make no doubt about it, you use your common sense while you’re there in the jury room. I'm interpolating here, going beyond what I've written out, because it’s important to explain the difference. While you use your common sense, don't think that the standard of proof here is, well, common sense. The standard of proof is proof beyond a reasonable doubt. You use your common sense to figure out what you believe. And then you ask yourself as to each separate charge and each separate individual has the government proved that charge beyond a reasonable doubt.
 

 [11]
 

 .
 
 Allen v. United States,
 
 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).
 

 [12]
 

 . At sentencing, Michael Murray's counsel essentially conceded the upward adjustment for manager or supervisor, but not for organizer or leader. The difference is significant. The former calls for a sentence of 235 to 293 months, whereas the latter calls for a range of 292 to 365 months. Michael Murray was sentenced near the top of the range.