<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                 United States Court of Appeals
                     For the First Circuit
                      ____________________

No. 97-1069

                         UNITED STATES,

                           Appellee,

                               v.

                        ANTHONY M. SHEA,

                     Defendant, Appellant.

                      ____________________

          APPEAL FROM THE UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF MASSACHUSETTS

        [Hon. Douglas P. Woodlock, U.S. District Judge]

                      ____________________

                             Before

                    Torruella, Chief Judge,

                 Aldrich, Senior Circuit Judge,

                  and Boudin, Circuit Judge.  

                     _____________________

   David H. Mirsky, by appointment of the Court, for appellant.
   Ben T. Clements, Assistant United States Attorney, with whom
Donald K. Stern, United States Attorney, was on brief for appellee.

                      ____________________

                        July 24, 1998
                      ____________________

         TORRUELLA, Chief Judge.  Defendant Anthony M. Shea
 appeals his four-count conviction stemming from an attempted
 bank robbery involving two other co-defendants, John Schurko
 and Nicolas DiMartino.  Schurko had pled guilty prior to trial,
 and Shea and DiMartino were tried together and convicted on all
 counts before a jury.  Shea was sentenced to 382 months of
 imprisonment.
          Shea challenges the district court's denial of his
 motion to suppress several statements he made after his arrest
 and of his motion for discovery of any rewards provided to FBI
 agents who were assigned to investigate him.  He also claims
 that the district court erred in its jury instructions
 regarding 18 U.S.C.  924(c), which prohibits the use and
 carrying of firearms during a crime of violence, and contests
 the sufficiency of the indictment for the  924(c) count.  
 Finally, the defendant argues that the government is precluded
 from asserting that he used and carried a certain semiautomatic
 weapon which the government had previously attributed to his
 co-defendant Schurko.  We affirm.
                             I.  BACKGROUND  On an appeal from a criminal conviction, we summarize
 the facts in the light most favorable to the jury's verdict.  
 See United States v. Gonzlez-Maldonado, 115 F.3d 9, 12 (1st
 Cir. 1997).
          On August 11, 1995, after several days of planning,
 Shea, Schurko, and DiMartino attempted to rob the Wakefield
 Savings Bank in Wakefield, Massachusetts.  Their preparations
 included an initial stakeout of the bank, the theft of the
 robbery and switch cars, and a dry run of the getaway route
 from the bank.  At about 4:15 p.m. on August 11, Shea, wearing
 a Halloween mask and driving a Jeep Cherokee, with Schurko in
 the backseat, approached the bank.  When the Cherokee was about
 60 to 65 yards from the bank, several cars containing FBI
 agents confronted Shea, who then attempted to flee.  However,
 Shea's car was forced into a telephone pole.
          Agents removed Shea, who was carrying a police
 scanner and was armed with a fully-loaded Smith & Wesson
 revolver tucked in his pants, from the driver's seat and
 Schurko from the rear passenger seat of the Cherokee.  In the
 rear seat, agents recovered a Halloween mask, an Intratec 9-
 millimeter semiautomatic assault weapon, which was loaded with
 42 rounds of ammunition including one round in the chamber, and
 a magazine full of ammunition to which an additional clip full
 of ammunition had been attached.  DiMartino, who had remained
 waiting in Shea's Ford Bronco at a parking area about a half
 mile away from the savings bank, was also apprehended by FBI
 agents.
          Shea was charged in a three-defendant, four-count
 indictment with conspiracy to commit armed bank robbery under
 18 U.S.C.  371 ("Count One"); attempted bank robbery under 18
 U.S.C.  2113(a) & 2 ("Count Two"); use and carrying of
 firearms during and in relation to a crime of violence, here,
 attempted bank robbery, under 18 U.S.C.  924(c)(1) & 2
 ("Count Three"); and felon in possession of ammunition under 18
 U.S.C.  922(g)(1) ("Count Four").  While Schurko pled guilty
 prior to trial, Shea and DiMartino were tried together before
 a jury.  The jury found Shea guilty of all counts, and he was
 sentenced to a total of 382 months of imprisonment.
                         II.  DISCUSSION     A.   Post-Arrest Statements
          Shea contests the district court's denial of his
 pretrial motion requesting that the court suppress the
 following post-arrest utterances of Shea, which were later
 admitted at trial:
          "How did you know I was here?"
          "Where did you come from?"
          "I should have gone home."
          "What do you got me for, a stolen jeep?"
          "What am I going to get for bank robbery, forty
          years?    I'll be out when I'm seventy."
  
 The basis for the suppression motion was that these statements
 were made while Shea was in custody but prior to his being
 advised of his Miranda rights.  We review de novo the district
 court's application of Miranda jurisprudence to the challenged
 statements.  See United States v. Ventura, 85 F.3d 708, 710
 (1st Cir. 1996).  For the first time on appeal, Shea also
 objects to the admission of his responses to questions
 regarding his name and whether he had any weapons.  As to these
 utterances, "we review for plain error and reverse only if an
 'obvious' or 'clear' error exists that affects 'substantial
 rights.'"  United States v. Guerrero, 114 F.3d 332, 341 (1st
 Cir. 1997).
          All of the statements at issue were elicited under
 the following circumstances.  As Shea was being arrested,
 Special Agent Mark Little asked him his name and whether he had
 any weapons or needles.  Shea provided his name and stated that
 he only had a scanner.  While he was being arrested, Shea was
 also heard saying that he should have gone home and asking how
 the agents knew he was there.  After Shea was secured and his
 guns seized, he was turned over to Special Agent Todd Richards
 to be transported to the FBI office.  As Richards was placing
 Shea in the car, Shea stated:  "What am I going to get for bank
 robbery, forty years?  I'll be out when I'm seventy."  On route
 back to the FBI office, Shea asked the agents, "What do you got
 me for, a stolen jeep?"
          Law enforcement officers must inform suspects of
 their Miranda rights prior to "custodial interrogation."  SeeVentura, 85 F.3d at 710.  It is essentially undisputed that
 Shea was in the custody of FBI agents at the time he made the
 challenged statements.  Thus, we focus our inquiry on whether
 the defendant was subjected to interrogation.  The Supreme
 Court has determined that the term "interrogation" refers not
 only to direct questioning, "but also to any words or actions
 on the part of the police (other than those normally attendant
 to arrest and custody) that the police should know are
 reasonably likely to elicit an incriminating response from the
 suspect."  Rhode Island v. Innis, 446 U.S. 291, 301 (1980).  In
 other words, Miranda warnings are required "whenever a person
 is subjected to either express questioning or its functional
 equivalent."  Id. at 300-301.
          We understand Shea's argument to be that the number
 of FBI agents and degree of force used to arrest Shea somehow
 amounted to the functional equivalent of interrogation.  
 Therefore, Shea contends that he should have been informed of
 his Miranda rights immediately upon his arrest.  We disagree.
          As to the statements at issue in his motion to
 suppress, the defendant fails to identify any specific acts or
 statements by FBI agents which were "reasonably likely to
 elicit an incriminating response from [him]."  Innis, 446 U.S.
 at 301.  No evidence suggests that the FBI coerced Shea into
 making these statements.  Indeed, the record shows that all of
 these statements were spontaneous utterances, which we deem to
 be admissible.  See United States v. Rogers, 41 F.3d 25, 31
 (1st Cir. 1994) (affirming admission of statements that were
 "voluntary and spontaneous"); United States v. Taylor, 985 F.2d
 3, 7 (1st Cir. 1993) (allowing admission of statements made
 from conversation "spontaneously initiated" by suspect); United
 States v. Voice, 627 F.2d 138, 144 (8th Cir. 1980) (finding no
 Miranda violation where officer did "no more than record
 defendant's spontaneous responses").  Accordingly, we affirm
 the district court's denial of the suppression motion.
          We also rule that the district court did not clearly
 err in admitting Shea's answers to questions regarding his name
 and whether he had any weapons.  The FBI agent's inquiry about
 the suspect's name falls squarely within the exception
 established in Pennsylvania v. Muiz, 496 U.S. 582 (1990), for
 routine booking questions.  See id. at 601 (questions regarding
 suspect's name, address, height, weight, eye color, date of
 birth and current age did not qualify as custodial
 interrogation).  Furthermore, Shea's answer to the agent's
 question whether he had any weapons is admissible under the
 public safety exception to Miranda established in New York v.
 Quarles, 467 U.S. 649, 659 (1984) (finding exception to Mirandafor "questions [by police] necessary to secure their own safety
 or the safety of the public").
          Shea responds that the question was not motivated by
 a concern for public safety because Agent Little's testimony
 suggests that he would have searched the defendant completely
 regardless of Shea's answer.  However, we note the context in
 which the question was asked: the agent had just apprehended an
 individual suspected of attempting to commit a violent crime,
 armed bank robbery.  The arresting agent's question would have
 facilitated the securing of any weapons on Shea's person
 whether or not the agent intended to conduct a search of the
 suspect.  Finding no clear error, we affirm the admission of
 Shea's response.
          B.   Merit Awards to FBI Agents
          Shea asserts that the district court erroneously
 denied his motion for the discovery of money or rewards
 provided to certain FBI agents, who were assigned to
 investigate the defendant.  Relying on Brady v. Maryland, 373
 U.S. 83, 87 (1963), Shea contends that since the requested
 information was materially exculpatory, the government violated
 his Fifth Amendment due process rights by failing to disclose
 such information.  We review a district court's denial of a
 discovery motion for abuse of discretion.  See United States v.
 Phaneuf, 91 F.3d 255, 260 (1st Cir. 1996).
          In Brady, the Supreme Court held "that the
 suppression by the prosecution of evidence favorable to an
 accused upon request violates due process where the evidence is
 material either to guilt or to punishment . . . ."  373 U.S. at
 87.  Exculpatory evidence is "material" only if "there is a
 reasonable probability that, had the evidence been disclosed to
 the defense, the result of the proceedings would have been
 different."  United States v. Bagley, 473 U.S. 667, 682 (1985).  
 In turn, a "reasonable probabilty" is one that is "sufficient
 to undermine confidence in the outcome."  Id.  Shea argues that
 the requested information would have been relevant to show bias
 on the part of the government's FBI witnesses.  Since the
 government's case depended almost completely on the testimony
 of these witnesses, he asserts that, if this information had
 been disclosed, it would have altered the jury's conviction.
          The defendant has failed to articulate a theory as to
 how the requested information would exculpate him.  The
 pretrial discovery motion requests that the district court
 "order the government to make available the amounts of money or
 other rewards, e.g., promotion, step raises, transfers to
 office of choice, provided to the special agents assigned to
 the matters pertaining to [him]" (emphasis added).  It is
 important to note that Shea's motion does not seek information
 regarding awards that were contingent on any agent's testimony.  
 In our view, the fact that FBI agents may have received merit
 awards for the arrest of Shea would not have changed the
 outcome of the trial.  The jury was well aware that law
 enforcement officers are paid to investigate crimes and make
 arrests.  Absent particularized allegations of agent
 misconduct, the most reasonable inference a jury might make
 from the existence of a merit award program is that Shea was a
 particularly dangerous suspect worthy of special attention.
          Shea also argues that the district court's denial of
 his discovery motion violated his Sixth Amendment right to
 confront witnesses by limiting his ability to uncover witness
 bias.  We reject this argument outright.  Even without the
 sought-after information, defense counsel could have questioned
 testifying agents about this issue.  Moreover, we find no
 evidence in the record that the district court foreclosed
 cross-examination by the defense on FBI merit awards.  At
 trial, Shea's counsel asked one agent, Agent Little, whether
 the FBI had "a program whereby agents who make good
 [surveillance] pictures or get convictions, get rewarded by
 transfers, promotions or cash awards."  The government did not
 object to this question.  When the agent testified that he did
 not know because he had "never gotten one," defense counsel
 responded, "I can see why."  The record reflects that the
 government objected to this last retort, and the judge properly
 sustained the objection.  We do not adopt Shea's reading of the
 trial transcript that the district court, in effect, foreclosed
 an inquiry into FBI merit awards by sustaining this objection.  
 Therefore, we rule that the district court did not abuse its
 discretion in denying Shea' discovery motion.
          C.   Pinkerton Theory of Liability
          Shea avers that the district court erred in
 instructing the jury on Count Three, which charged him with the
 use and carrying of firearms during and in relation to a crime
 of violence, here, attempted bank robbery, in violation of 18
 U.S.C.  924(c).  We engage in de novo review of an alleged
 jury instruction error "involv[ing] the interpretation of the
 elements of a statutory offense."  See United States v.
 Pitrone, 115 F.3d 1, 4 (1st Cir. 1997).  The district court
 instructed the jury as to three alternative theories of
 liability on this charge: direct principal liability; aider and
 abettor liability; and liability for the foreseeable acts of
 co-conspirators in furtherance of the conspiracy, pursuant to
 Pinkerton v. United States, 328 U.S. 640 (1946).  In its
 Pinkerton charge, the district court instructed the jury that
 it could find Shea guilty of violating  924(c), if it found,
 inter alia, "that the defendant could reasonably have foreseenthat the crime of using a firearm during or in relation to the
 attempted bank robbery might be committed by one or more of his
 co-conspirators" (emphasis added).
          Shea asserts that the Pinkerton instruction
 improperly permitted the jury to convict him on the  924(c)
 charge without satisfying the more stringent knowledge
 requirement for  924(c) aider and abettor liability.  Indeed,
 conviction under an aider and abettor theory of liability calls
 for a higher mens rea requirement than that required for
 Pinkerton liability.  In Pinkerton, the Supreme Court ruled
 that a co-conspirator may be held vicariously liable for the
 reasonably foreseeable substantive offenses committed by other
 co-conspirators in furtherance of the conspiracy.  See 328 U.S.
 at 647-48.  In contrast, for aider and abettor liability to
 attach, the government must prove that Shea knew to a
 "practical certainty" that the principal would be using a
 weapon during the commission of the armed bank robbery.  United
 States v. Spinney, 65 F.3d 231, 239 (1st Cir. 1995).  However,
 Shea's assertion that the more strict knowledge requirement for
 aider and abettor liability somehow negates the lower mens rea
 requirement for an alternative Pinkerton charge has no support
 in case law or common sense.
          Shea's argument relies primarily on this court's
 decision in Spinney.  We find Spinney, which reversed a
 defendant's conviction on a  924(c) charge because the
 government failed to establish that the defendant knew to a
 "practical certainty" that the principal would be using a
 weapon during a bank robbery, see id. at 239, to be inapposite.  
 In Spinney, the defendant, Jeffrey Spinney, was indicted for
 conspiracy to commit armed bank robbery, aiding and abetting an
 armed bank robbery, and aiding and abetting the use of a
 firearm during and in relation to a crime of violence.  
 However, because the conspiracy count was dismissed, the
 district court never issued a Pinkerton instruction for the  
 924(c) offense.  Thus, in Spinney, we simply stated the
 requisite knowledge requirement for an aider and abettor theory
 of liability without addressing the applicability of a
 Pinkerton instruction to a  924(c) violation.
          We agree with a number of our sister circuits that
 Pinkerton liability attaches to the use-or-carrying-of-a-
 firearm offense proscribed in  924(c).  See, e.g., United
 States v. Wilson, 135 F.3d 291, 305 (4th Cir. 1998); United
 States v. Washington, 106 F.3d 983, 1011 (D.C. Cir. 1997);
 United States v. Masotto, 73 F.3d 1233, 1240 (2d Cir. 1996);
 United States v. Myers, 102 F.3d 227, 237 (6th Cir. 1996),
 cert. denied, __ U.S. __, 117 S. Ct. 1720 (1997); United Statesv. Wacker, 72 F.3d 1453, 1464 (10th Cir. 1995).  We cannot
 "attribute to Congress an intent to punish other [violent
 criminal] activity where a gun is carried while exempting
 conspiracy, a situation that is traditionally considered more
 dangerous."  United States v. Daz, 864 F.2d 544, 548 (7th Cir.
 1988).
          While this court has yet to address a direct
 challenge to the applicability of a Pinkerton instruction to a
  924(c) charge, we assumed its applicability in United Statesv. DeMasi, 40 F.3d 1306, 1319-20 (1st Cir. 1994).  In that
 case, the district court instructed the jury on Pinkertonliability for a  924(c) charge stemming from an attempted
 robbery of an armored truck, but failed to include the
 "reasonably foreseeable" qualification to the instruction.  
 This court found that "the use of firearms during and in
 relation to the attempted robbery . . . was part and parcel to
 the object of the conspiracy itself."  DeMasi, 40 F.3d at 1319.  
 Accordingly, the court held that "no rational jury could have
 found that [the defendant] conspired to rob the Brink's truck
 . . . without also finding that the use of firearms in that
 robbery would be reasonably foreseeable."  Id. at 1319-20.  
 Thus, in DeMasi, this circuit sustained a  924(c) conviction
 under a Pinkerton theory of liability.  Here, we make explicit
 our view that a jury may be instructed on Pinkerton liability
 in connection with a charged violation of  924(c) either as
 the sole or as an alternative theory of liability.
          D.   Knowledge of Features of Assault Weapon
          Shea alleges that the district court erred in failing
 to instruct the jury that he must have knowledge of the
 features of the Intratec 9-millimeter weapon which brought it
 within the scope of the assault weapons provision of  
 924(c)(1).  Section 924(c)(1) provides in pertinent part:
          Whoever, during and in relation to any crime
          of violence . . . uses or carries a firearm,
          shall . . . be sentenced to imprisonment for
          five years, and if the firearm is a short-
          barreled rifle, short-barreled shotgun, orsemiautomatic assault weapon, to
          imprisonment for ten years, and if the
          firearm is a machinegun, or a destructive
          device, or is equipped with a firearm
          silencer or muffler, to imprisonment for
          thirty years.
  
 18 U.S.C.  924(c)(1) (emphasis added).  The defendant argues
 that the semiautomatic assault weapon clause of this section is
 a separate offense, which requires the jury to make a finding
 that Shea knew of the gun's features.  Shea presents a question
 of first impression for this circuit.
          We rule that the assault weapon provision is not an
 element of the  924(c)(1) offense, but instead, a sentencing
 enhancement.  "When deciding how a particular statutory
 allusion should be construed, an inquiring court must mull the
 language and structure of the statute, and, when necessary, its
 legislative history."  United States v. Rivera-Gmez, 67 F.3d
 993, 1000 (1st Cir. 1995) (finding "death results" provision of
 18 U.S.C.  2119 (3) to be sentence enhancer rather than
 separate offense).  The language and structure of  924(c)(1)
 suggest that Congress intended the assault weapon clause to
 serve as a sentence enhancer.  The section begins by
 criminalizing the use and carrying of a firearm during the
 commission of a predicate offense, a crime of violence, and
 establishes a base sentence of 5 years for a violation.  The
 weapons clauses that follow, including the assault weapon
 provision, are not structurally independent, but rather are
 integrated into the main use-and-carrying offense.  "Ripped
 from their textual moorings, [these clauses] would be little
 more than gibberish . . . ."  Rivera-Gmez, 67 F.3d at 1000.
          Traditional indicia that a provision is a sentence
 enhancer include an explicit reference to a prior conviction
 under the statutory section at issue; special sentencing
 procedures; a penalty which is a multiplier of the sentence for
 the underlying crime; or a title denoting it as a sentence
 enhancer.  See United States v. Rumney, 867 F.2d 714, 718 (1st
 Cir. 1989).  The 10-year sentence for using and carrying an
 assault weapon (as well as the 30-year sentence under the
 machinegun provision) are multipliers of the 5-year base
 sentence, providing further evidence of congressional intent to
 enhance sentences under certain aggravating circumstances.
          The statute's legislative history confirms our
 interpretation of the section.  Congress initially created  
 924(c) without distinguishing among types of firearms.  SeeUnited States v. Branch, 91 F.3d 699, 739 (5th Cir. 1996)
 (citing Gun Control Act of 1968, Pub. L. No. 90-618,  102, 82
 Stat. 1213 (1968) (prohibiting use or carrying of "firearm"
 during commission of "any felony")).  Then, in 1986, Congress
 added the machinegun clause to the statute.  See Firearms
 Owners' Protection Act, Pub. L. No. 99-308,  104, 100 Stat.
 449, 456 (1986).  "Noticeably absent from both the House Report
 and floor debates [accompanying the 1986 Act] was any
 discussion suggesting the creation of a new offense."  Branch,
 91 F.3d at 739.  In 1990, Congress appended the short-barreled
 rifle, short-barreled shotgun and destructive device provisions
 to the section, again without evincing an intent to create new
 offenses for these weapons.  See Crime Control Act of 1990,
 Pub. L. No. 101-647,  1101, 104 Stat. 4789, 4829 (1990).  
 Finally, the semiautomatic assault weapon clause was added in
 1994 to the list of weapons in  924(c)(1) without creating a
 separate section.  See Violent Crime Control and Law
 Enforcement Act of 1994, Pub. L. No. 103-322,  110102(c)(2),
 as amended, Pub. L. No. 104-294,  603 (p)(1), 108 Stat. 2015
 (1994).
          Shea asserts that Staples v. United States, 511 U.S.
 600 (1994), in which the Supreme Court held that the government
 needs to prove knowledge of the type of firearm for a
 conviction under 26 U.S.C.  5861(d), compels us to make a
 similar determination for  924(c)(1).  However, we can easily
 distinguish the situation in Staples from the present case
 because, unlike  924(c)(1), the statute in Staples prohibited
 possession of certain types of firearms but was silent as to
 the mental state required for the commission of the offense.  
 As the Eleventh Circuit noted in United States v. Brantley, 68
 F.3d 1283, 1289 (11th Cir. 1995), the Staples court wished to
 avoid dispensing with a mens rea requirement "where doing so
 would 'criminalize a broad range of apparently innocent
 conduct.'" Id. at 1289 (quoting Staples, 511 U.S. at 609).  
 Such concerns are absent here because "the  924(c) defendant
 whose sentence is enhanced based on the type of weapon he
 carried has demonstrated a 'vicious will' by committing the
 principal offense."  Brantley, 68 F.3d at 1290.  Accordingly,
 we reject Shea's argument that a conviction under the statute
 required the government to prove knowledge of the features of
 the Intratec 9-millimeter weapon.
          Shea also argues that the district court's imposition
 of a 10-year sentence for the  924(c) violation constituted a
 constructive amendment to the original indictment because the
 indictment failed to charge the assault weapon in Count Three
 either directly or by incorporation.  This argument rests
 entirely upon the assumption that the assault weapon clause
 creates a separate offense.  Having determined that the clause
 acts as a sentence enhancer, see supra, we reject Shea's
 constructive amendment claim without further comment.
          E.   Judicial Estoppel
          Shea alleges that the government is judicially
 estopped from asserting that he used or carried the Intratec 9-
 millimeter weapon because during the detention hearing of his
 co-defendant Schurko, the government linked the gun to Schurko
 rather than to Shea.  At Schurko's detention hearing, the
 government stated in closing argument that, "[t]he notion . .
 . that somehow that gun should be linked to Shea, who was in
 the front seat, rather than [Schurko], who was sitting on it
 when he was arrested, is simply absurd."  As this court
 observed in United States v. Kattar, 840 F.2d 118 (1st Cir.
 1988),
          The doctrine of judicial estoppel . . .
          prevents a party from asserting a position
          contrary to the position taken by the
          party in an earlier proceeding.  In this
          circuit, the doctrine is only applied when
          a litigant is "'playing fast and loose
          with the courts.'"
  
 Id. at 129-30 n.7 (citations omitted).  We choose not to apply
 this "obscure doctrine," id. at 130 n.7, here.  The
 government's closing argument at Schurko's detention hearing is
 not inconsistent with its position in the prosecution of Shea
 where it pursued accomplice as well as principal theories of
 liability for the use and carrying of the Intratec 9-millimeter
 weapon.  Therefore, we see no ground for reversal on this
 point.
                           III.  CONCLUSION
                                             For the foregoing reasons, we affirm the defendant's
 conviction.
 

</body>

</html>