USCA1 Opinion

 

 United States Court of Appeals For the First Circuit ____________________No. 97-2101 UNITED STATES, Appellee, v. DAMIAN FERRERAS, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Ronald R. Lagueux, U.S. District Judge] ____________________ Before Torruella, Chief Judge, Lipez, Circuit Judge, and Fusté, District Judge. _____________________ Alan Scribner, by appointment of the Court, for appellant. Zechariah Chafee, Assistant United States Attorney, with whomMargaret E. Curran, United States Attorney, was on brief, forappellee. ____________________ September 15, 1999 ____________________ TORRUELLA, Chief Judge. Appellant Damian Ferreras("Ferreras") was charged with possession with intent to distributeover fifty grams of cocaine base in violation of 21 U.S.C.§ 841(a)(1) & (b)(1)(A). The district court heard testimony onFerreras's motion to suppress the physical evidence seized in hisapartment and, on the same day, the court denied the motion. Subsequently, the case was tried before a jury and Ferreras wasconvicted of the sole count on which he was tried. At thesentencing hearing, the government produced testimony that thecocaine base was crack. The district court found that thesubstance was crack and sentenced Ferreras on that basis. Ferreraswas sentenced to 121 months imprisonment and five years ofsupervised release. As a condition of supervision, Ferreras wasordered to surrender at the completion of his term of imprisonmentto the Immigration and Naturalization Service for deportationproceedings. This appeal followed. BACKGROUND The following facts were adduced at trial. OnFebruary 19, 1997, at 4:30 p.m., detectives from the ProvidencePolice Intelligence Bureau went to the vicinity of 30 Pekin Street,Providence with a search warrant for the second floor apartment atthat address. 30 Pekin Street is a three story tenement house. The detectives saw Damian Ferreras's car parked in front of thehouse. Damian Ferreras came out of a side door of the house andgot into the car. The detectives stopped the car down the streetand told Ferreras that they had a search warrant for his apartment. An electronic pager was seized from Ferreras and he and his carwere brought back to the house. At the house, a detective used a key from the key ringtaken from the ignition of Ferreras's car to open the side door ofthe building. A team of detectives went to the second floor andsearched the bedrooms, kitchen, and bathroom for narcotics. Detectives Edward Leste and David Lussier went up the stairs to theattic where three bedrooms had been constructed. Detective Lussierused a key from Ferreras's key ring to unlock one of the bedroomdoors. In a small closet in this bedroom Detective Leste found apair of high leather boots. From one of the boots he withdrew aclear plastic bag which held 101.74 grams of cocaine base. Thedetective, who has extensive experience in seizures of crackcocaine, recognized the cocaine base as being the lumpy, rocklikesubstance known as crack. From the boot he also pulled $1,750 incash. Searching the room further, the detective found, in a framefor a stereo speaker, an electronic digital scale of a typecommonly used to weigh narcotics. On top of the frame thedetective found several pieces of personal paperwork bearing thename of Damian Ferreras, including recent court documents. Thedetectives testified that pagers, quantities of cash, electronicscales, and drugs, taken together, are common elements of drugsales operations. The bedroom had one bed mattress on a box spring and ayoung man's clothing in the closet. There was no indication thatanyone other than Ferreras stayed in the bedroom. Ferreras wasbrought to the Providence Police Station where he was escorted tothe Intelligence Bureau Office. He was informed of his Mirandawarnings in Spanish and English and questioned by DetectiveLussier. Ferreras told the detective that the boots found in hiscloset by Detective Leste had been bought by Ferreras on CanalStreet in New York City. He said that the apartment where he wasstaying belonged to his mother, that he slept in the upstairsbedroom periodically, and that he had last slept in the bedroom twonights previously but had spent the last night at his girlfriend'splace. Ferreras went on to say that the money in the boot belongedto him, but that the drugs belonged to another man, for whomFerreras was holding the drugs. Ferreras said he did not know thename of the other person but could call him on the telephone. The crack seized from the boot was analyzed at the RhodeIsland Drug Chemistry Laboratory and tested positive for thepresence of cocaine base. The drugs weighed 101.74 grams (3.58ounces). The detectives testified from their experience that thevalue of crack was about $1,000 to $1,200 per ounce and that thisquantity of crack was definitely intended for distribution. Ferreras moved to suppress the physical evidence ongrounds that the search of the third floor exceeded the scope ofthe warrant. The government entered into evidence the searchwarrant, the complaint, and the affidavit. The face of the affidavit showed that Detective EdwardLeste of the Providence Police Department had information from areliable informant that Damian Ferreras "is storing and sellingcocaine from his apartment located at 30 Pekin Street, 2nd floorapt., and also storing cocaine in the basement . . . ." Theaffidavit described 30 Pekin Street in Providence as a "2 1/2 storydwelling and being grey with white trim in color." The affidavit further showed that Detective Leste, withina few days prior to February 19, 1997, had sent an informant into30 Pekin Street to buy cocaine. The informant came out withcocaine and said that he had bought it from Damian Ferreras whileinside the second floor apartment. On February 19, 1997 a state court judge issued a warrantto search for cocaine, drug sale paraphernalia, and drug money. The search warrant stated: Place and person to be searched: 30 Pekin Street, 2nd floor apartment and basement Damian Ferreras, John Doe, dob-2-21-75. Later that day a Providence Police raid team went toexecute the warrant at 30 Pekin Street. Ferreras walked out of thehouse, got into a car, and drove down the street. He was stoppedby the police and brought back to the building he had just leftalong with a set of keys from the ignition of the car he had beendriving. The police used a key from the ring to enter a side dooron the ground floor of the building. Just inside the entrance there was a door leading to thecellar and a flight of stairs up to the second floor. At the topof the stairs was a door with a lock. The door opened into a smallhallway on the second floor, and was closed but not locked. About five feet to the right of the stairway door was alocked door which the police opened with a key from Ferreras's keyring. Through this door, the police entered living quarters on thesecond floor including a kitchen, two bedrooms, a bathroom, and aliving room. About eight feet across the vestibule from the doorto the second floor living quarters another set of steps led to theattic. There was no door at the bottom, or at the top of the stepsfrom the second floor hallway to the attic. In the attic the police saw a hall with three rooms in arow on the left-hand side. These rooms appeared to have beenrecently constructed and not part of the original building. Thefirst room's door was closed and locked and a detective opened itwith another key from Ferreras's key ring. Inside was a box-springand mattress and a closet full of a man's clothes. Inside a bootthe police found the over 100 grams of crack. There was also atelevision set with a cable leading through a hole in the floor tothe second story. The second room also had a bed and appeared to have beenlived in. The third one had only a mattress. The right-hand sideof the hallway was divided into two unfinished rooms which werestill under construction and revealed plaster, sheetrock, tools,dirty floors, and in one room a metal can of urine. There was nosink, shower, bathtub, kitchen, refrigerator, stove, or pantry, andno running water anywhere in the attic. There was a space heaterin one of the attic rooms. The only access to the attic was viathe set of steps from the small hallway on the second floor. Adetective examined the electric meters on the exterior of thebuilding and found that one was for the first floor apartment, andthe other for the second floor. There was none for the attic. Ferreras called his brother Victor Ferreras who testifiedthat on February 19th there was a door at the foot of the stepsleading to the attic, that there was a working sink and toilet inthe attic, and that there had been a shower but that he haddismantled it before the date of the raid. Victor Ferreras saidthat he had been manager of the property and that his brother andanother man lived in the attic. He said his mother lived on thesecond floor but had been away in the Dominican Republic on the daythe police entered. In rebuttal the government entered into evidence thetestimony of a defense investigator given at a bail hearing on thecase on March 6, 1997. That investigator testified that he hadexamined the attic just after the police raid and had not seen abathroom. The district court found that Victor Ferreras's testimonywas not credible. Based on the facts described by the police, thecourt found that the attic and second floor were all one apartment. He thus found that the search of the attic was within the scope ofthe search warrant. At sentencing, Ferreras argued that the substance thatwas identified by the chemist as cocaine base at trial was not theform of cocaine base known by the street term "crack." Thegovernment called as its witness Sargent David Lussier who hadserved nearly eleven years on the Providence Police force. During his tenure on the force he had been involved in hundreds ofinvestigations of crack cocaine trafficking, including seizures ofthe drug and arrests of those trafficking it. He had participatedin a number of law enforcement courses, including a two week schoolrun by the Drug Enforcement Administration, during which he hadstudied aspects of drug investigations. Lussier explained howcrack is prepared, based on his instruction at school. At thehearing he examined the cocaine base which had been seized fromFerreras's boot and noted that it was hard, lumpy, and brown. Hesaid that those were the characteristics of crack cocaine and gavehis opinion that the substance was crack. On cross-examination hefurther described the substance as crack based on "the feel, thetexture, the sight, everything I know about the subject . . . ." The court declared that it was satisfied "from all theevidence in the case" that Ferreras had possessed crack cocaine andimposed the minimum sentence of imprisonment within the applicableguideline range, 121 months, as requested by the government. DISCUSSIONI. The Suppression Motion On appeal, Ferreras challenges the district court'sdenial of his suppression motion, contending that the search of theattic at his 30 Pekin Street residence violated the FourthAmendment. His argument is without merit. Our review of a district court's decision to grant ordeny a suppression motion is plenary. See United States v.McCarthy, 77 F.3d 522, 529 (1st Cir. 1996). "We defer, however, toa district court's factual findings if, on a reasonable view of theevidence, they are not clearly erroneous." United States v.DeMasi, 40 F.3d 1306, 1311 (1st Cir. 1994). A clear error existsonly if, after considering all the evidence, we are left with adefinite and firm conviction that a mistake has been made. SeeUnited States v. McLaughlin, 957 F.2d 12, 17 (1st Cir. 1992). Moreover, we will uphold a district court's decision to deny asuppression motion provided that any reasonable view of theevidence supports the decision. See United States v. García, 983F.2d 1160, 1167 (1st Cir. 1993). The Fourth Amendment serves to protect the individual'sinterest in privacy. Any search intruding upon that privacyinterest must be justified by probable cause and must satisfy theparticularity requirement, which limits the scope and intensity ofthe search. See United States v. Bonner, 808 F.2d 864, 867 (1stCir. 1986). When investigators fail to limit themselves to theparticulars in the warrant, both the particularity requirement andthe probable cause requirement are drained of all significance asrestraining mechanisms, and the warrant limitation becomes apractical nullity. See id. The concern here is the particularityrequirement's limitation on the area to be covered by the searchoperation. The authority to search granted by any warrant is limitedto the specific places described in it, and does not extend toadditional or different places. See id. at 868. However, "searchwarrants and affidavits should be considered in a common sensemanner, and hypertechnical readings should be avoided." Id. Forexample, warrants authorizing a search of "premises" at a certainaddress authorize a search of the buildings standing on that land.See id. (citing United States v. Williams, 687 F.2d 290, 293 (9thCir. 1982); United States v. Meyer, 417 F.2d 1020, 1023 (8th Cir.1969)). This Court has held that a warrant authorizing a search of"the premises known as a single family trailer . . . with attachedcarport," also authorized the search of a disabled car, parkedadjacent to the carport, and a birdhouse hanging from a tree aboutfifteen feet from the trailer steps. See United States v. Asselin,775 F.2d 445, 447 (1st Cir. 1985). In United States v. Heldt, 668 F.2d 1238, 1265 (D.C. Cir.1981), the language "suite of offices of Mr. Heldt" was given justas broad an interpretation as "premises" was given in Asselin. Thecourt looked at the question of whether or not a free-standingoffice, not mentioned in the warrant, belonging to a person who didnot work for Heldt, could reasonably have been viewed by thesearching agents as constituting part of "the suite of offices ofMr. Heldt." See Heldt, 668 F.2d at 1263. The office wasreasonably considered by the searching agents as part of, or evenappurtenant to, the "properties" to be searched. See id. at 1265;see also United States v. Príncipe, 499 F.2d 1135 (1st Cir. 1974)(where warrant authorized search of particular apartment in abuilding, and cabinet was three to six feet away from entrance toapartment in small hallway opposite door to apartment, officersexecuting search warrant could reasonably suppose cabinet wasappurtenant to apartment). Just as in United States v. Bonner, 808 F.2d 864, 868(1st Cir. 1986), where we held that even though Bonner's "detachedtwo car garage" had never been mentioned in the description ofplaces to be searched, it would have been reasonably consideredwithin the scope of the warrant, the search of the attic at 30Pekin Street must be reasonably considered part of the areaintended to be searched. When one reached the second floor apartment at 30 PekinStreet, there was a door with a lock (although at the time of thesearch, the door was closed but not locked). The door opened intoa small hallway on the second floor. In this hallway, about eightfeet across the vestibule from the door to the second floor livingquarters, another set of steps led to the attic. There was no doorat either the bottom or the top of the steps securing access to theattic. It is clear from the evidence that the attic was notindependent from the second floor living quarters. Cabletelevision was supplied to the attic by a cable through a hole inthe floor to the second story. While three of the rooms in theattic had either a mattress or a bed, two rooms in the attic wereunfinished and contained sheetrock, tools, dirty floors, and ametal can of urine. There was no sink, shower, bathtub, kitchen,refrigerator, stove, food, or running water in the attic. Whilethere was an electric meter for the first floor, and one for thesecond floor, there was none for the attic. Given that: (1) the attic was open to the second floor,but not to the street or the first floor apartment; (2) the thirdfloor was not equipped for independent living; and (3) the occupantof the third floor had access to the second floor kitchen andbathroom, the district court's finding that the two floors were allone apartment, and conclusion that the search warrant for thesecond floor apartment included the half story above it iseminently reasonable and supported by the evidence.II. Sentencing Ferreras contends that the government failed to provethat the 101.74 grams of cocaine base seized from the apartment wasin fact crack cocaine. He complains that the government producedno evidence as to the water solubility of the cocaine base. Inlight of our opinion in United States v. Martínez, 144 F.3d 189(1st Cir. 1998), his contentions are meritless. In Martínez, we rejected an almost identical challenge. See id. at 190. We held squarely that, once the government laid aproper foundation "by introducing a chemical analysis proving that,chemically, the contraband was cocaine base," id. at 190 (quotingUnited States v. Robinson, 144 F.3d 104, 109 (1st Cir. 1998)(ellipses omitted), no further scientific evidence was needed. Instead, the government could bridge the evidentiary gap betweencocaine base and crack cocaine by presenting lay opinion evidence(or an opinion proffered by an expert who possessed practical asopposed to academic credentials) from "a reliable witness whopossesses specialized knowledge" (gained by experience in dealingwith crack or familiarity with its appearance and texture). Seeid.; see also Robinson, 144 F.3d at 108-09. Martínez and Robinsonare controlling here. As in Martínez, Ferreras posits that the governmentfailed to introduce testimony as to the water solubility of thecocaine base. That statement is true as far as it goes, but itdoes not take Ferreras very far. Water solubility is of noassistance in distinguishing among forms of cocaine base. SeeMartínez, 144 F.3d at 190. As we wrote in Robinson, 144 F.3d at108-09: "Chemical analysis cannot distinguish crack from any otherform of cocaine base because crack and all other forms of cocainebase are identical at the molecular level. Thus, no furtherscientific testimony would have been of any conceivable assistance . . . ." In this case, as in Martínez and Robinson, the governmentadduced competent scientific evidence from a chemist to prove thatthe 101.74 grams of contraband associated with Ferreras's arrestwas cocaine base. Given the witness's qualifications, his opinionconstituted competent proof of the fact that the substance wascocaine base. Once the government introduced the chemical testimony, noadditional scientific evidence was needed. From that pointforward, as in Martínez and Robinson, competent lay testimony, suchas that of Detective Leste, remarking on the substance'sdistinctive appearance and texture and identifying it as crack,completed the final link in the evidentiary chain. See Martínez,144 F.3d at 190. We need say no more, no less. In Robinson, we statedthat "[o]n the strength of [such] proof, and in the utter absenceof any controverting evidence," the district court's finding"easily survive[d] clear-error review." Robinson, 144 F.3d at 109. CONCLUSION For the reasons stated above, we affirm.